UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. _____     **09-80705**

Pending in the
Southern District of New York as:
Civil Action No. 08-Civ.-10520 (MGC)

MADELEINE L.L.C.,

      Plaintiff,

vs.

BRIAN STREET and JAMES H.
COHEN,

      Defendants.

_____/

**MC ZLOCH**

**ROSENBAUM**

FILED by _____ D.C.

MAY - 8 2009

STEVEN M. LARIMORE
CLERK U S DIST CT
S. D. of FLA. – MIAMI

### NOTICE OF FILING THE DECLARATION OF THOMAS MEEKS
### IN SUPPORT OF MOTION TO COMPEL PRODUCTION

    Plaintiff Madeleine L.L.C. hereby filing the attached declaration of Thomas Meeks in support of Plaintiff's Motion to Compel Production by Raymond J. Nicholson in Response to Plaintiff's Subpoena for the Production of Documents.

Dated: May 8, 2009

Respectfully submitted,

Thomas J. Meeks (314323)
Email: tmeeks@carltonfields.com
Carlton Fields, P.A.
4000 International Place
100 S.E. Second Street
Miami, Florida 33131-2114
Tel: (305) 530-0050
Fax: (305) 530-0055

Howard O. Godnick
(*Pro Hac Vice Pending*)
howard.godnick@srz.com
Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
(212) 756-2000
*Attorneys for Plaintiff*

15008723.1

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was delivered on

May 8, 2009, as specified below, to:

Raymond J. Nicholson
2494 South Ocean Blvd., Apt. 8B
Boca Raton, FL 33432
(via FedEx & process server)

Raymond J. Nicholson
5250 North Livernois Road
Rochester, MI 48306
(via FedEx)

Raymond Hannigan, Esq.
Email: rhannigan@herrick.com
Herrick, Feinstein LLP
2 Park Ave.
New York, New York 10015
Tel: 212-592-1400
*Attorneys for Brian Street and James Cohen*
(via FedEx)

THOMAS L. MEEKS

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. _____

Pending in the
Southern District of New York as:
Civil Action No. 08-Civ.-10520 (MGC)

MADELEINE L.L.C.,

       Plaintiff,

vs.

BRIAN STREET and JAMES H.
COHEN,

       Defendants.

_____/

## DECLARATION OF THOMAS MEEKS

Thomas Meeks, Esq., an attorney duly admitted to practice law before this Court,

declares, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a member of the law firm of Carlton Fields, P.A., attorneys for Madeleine

L.L.C. ("Plaintiff") in this action, and am familiar with the facts and circumstances set forth

herein.

2.      I respectfully submit this Declaration in support of Plaintiff's Motion to Compel

Production by Raymond J. Nicholson in Response to Plaintiff's Subpoena for the Production of

Documents.

3.      Attached hereto as Exhibit 1 is a true and correct copy of the Return of Service on

Raymond J. Nicholson, dated April 2, 2009.

4.      Attached hereto as Exhibit 2 is a true and correct copy of the Subpoena in a Civil Case, issued by this Court on April 1, 2009, commanding the production of documents by Raymond J. Nicholson.

5.      Attached hereto as Exhibit 3 is a true and correct copy of the letter Plaintiff sent to Raymond J. Nicholson by overnight Federal Express, dated April 30, 2009.

I declare under penalty of perjury that the foregoing is true and correct, and that this Declaration was executed on May 8, 2009.

Dated: May 8, 2009

Thomas J. Meeks

**EXHIBIT 1**

# RETURN OF SERVICE

## UNITED STATES DISTRICT COURT
### Palm Beach District of Florida

Case Number: 08-CIV-10520

Plaintiff:
**MADELEINE L.L.C.**

vs.

Defendant:
**BRIAN STREET and JAMES H. COHEN**

For:
Howard O. Godnick
SCHULTE ROTH & ZABEL
919 Third Avenue
New York, NY 10022

Received by MULBERRY LEGAL SERVICES, INC. on the 2nd day of April, 2009 at 11:07 am to be served on **RAYMOND J. NICHOLSON, 2494 SOUTH OCEAN BLVD., APT. 8B, BOCA RATON, FL 33432**.

I, ANASTASIA L. MAILLARD, do hereby affirm that on the **2nd day of April, 2009 at 8:30 pm, I:**

**INDIVIDUALLY** served by delivering a true copy of the **SUBPOENA IN A CIVIL CASE WITH EXHIBIT A** with the date and hour of service endorsed thereon by me, to: **RAYMOND J. NICHOLSON** at the address of: **2494 SOUTH OCEAN BLVD., APT. 8B, BOCA RATON, FL 33432**, and informed said person of the contents therein, in compliance with state statutes.

**Military Status:** ( ) YES ( X )NO

**Description** of Person Served: Age: 70, Sex: M, Race/Skin Color: White, Height: 5'10, Weight: 250, Hair: Gray, Glasses: Y

I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served. Under penalty of perjury, I declare that I have read the foregoing document, and that the facts stated in it are true. NO NOTARY REQUIRED PURSUANT TO F.S. 92.525(2).



ANASTASIA L. MAILLARD
#1072

MULBERRY LEGAL SERVICES, INC.
4050 Lakespur Circle South
Palm Beach Gardens, FL 33410
(561) 624-0526

Our Job Serial Number: 2009001734

**EXHIBIT 2**

AO88 (Rev. 12/07) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

Southern District of Florida

Madeleine L.L.C.

V.

Brian Street and James H. Cohen

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  08-Civ.-10520

(case pending in the United States District Court for the Southern District of New York)

TO:  Raymond J. Nicholson
2494 South Ocean Blvd., Apt. 8B
Boca Raton, FL 33432

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Exhibit A

| PLACE   Law Offices of Carlton Fields, 4000 International Place 100 S.E. Second Street Miami, Florida 33131-2114 | DATE AND TIME 4/30/2009 10:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE Nov 1, 2009 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Howard O. Godnick, Schulte Roth & Zabel (Attorneys for Plaintiff)
919 Third Avenue New York, New York 10022  (212) 756-2000

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88  (Rev.  12/07) Subpoena in a Civil Case (Page 2)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                        DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.
(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
(2) Command to Produce Materials or Permit Inspection.
(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
(3) Quashing or Modifying a Subpoena.
(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information;
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial
(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) DUTIES IN RESPONDING TO A SUBPOENA.
(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) Claiming Privilege or Protection.
(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT.
The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## EXHIBIT A

## DEFINITIONS

1.      The definitions and rules of construction set forth in Rules 26, 34 and 45 of the

Federal Rules of Civil Procedure and Rules 26.2 and 26.3 the Local Civil Rules for the Southern

and Eastern Districts of New York are incorporated by reference as if set forth fully herein.

2.      The term "Answer, Affirmative Defenses and Counterclaim" means the Answer,

Affirmative Defenses and Counterclaim, dated December 23, 2008, filed by the Defendants in

the above-captioned action, a copy of which is attached hereto as Exhibit 1.

3.      The term "any" shall be construed as all *and* each (*i.e.*, every), so as to bring

within the scope of the subpoena all responses that might otherwise be construed to be outside its

scope.

4.      The term "Communication" means, in addition to the definition set forth in Rule

26.3(c)(1) of the Local Civil Rules for the Southern and Eastern Districts of New York, every

manner or means of disclosure, transfer, transmittal or exchange of information (in the form of

facts, ideas, inquiries or otherwise), whether by document, electronically, telecopier, mail,

personal delivery, orally or otherwise, whether recorded or unrecorded.

5.      The term "Companies" means Boca Developers, Inc. and any of its predecessors,

parents, subsidiaries or other affiliates, as well as any other corporations, partnerships, joint

ventures, or any other legal entities currently or formerly owned, associated with or controlled by

the Defendants, jointly or severally, at any time during the period July 6, 2006 through the

present, and all persons acting or purporting to act on their behalf, including current or former

officers, directors, employees, agents, servants, authorized representatives, attorneys or other

retained professionals.

6.      The term "Complaint" means the Complaint, dated December 4, 2008, filed by Madeleine in above-captioned action, a copy of which is attached hereto as Exhibit 2.

7.      The term "Defendants" means Brian Street and James H. Cohen, individually and collectively, and all persons acting or purporting to act on their behalf.

8.      The term "Escrow Account" means the escrow account established pursuant to the Biscayne Landing Escrow Agreement dated April 17, 2006, and executed between Ticor Title Insurance Company and Defendant Cohen on behalf of BLIA Developers, Ltd., a copy of which is attached to the Complaint as Exhibit J.

9.      The term "Financial Institution" means any bank, savings and loan association, credit union, stock brokerage, asset management firm and similar business both in the United States and elsewhere.

10.     The term "Ground Lease Rent" means any amounts required to be paid periodically to the City of North Miami pursuant to the terms of Article II of the long-term ground lease, dated October 18, 2005, entered into between the City of North Miami and BLIA Developers, Ltd., and attached as pages 75-116 of Exhibit E to the Complaint.

11.     The term "Mezzanine Loan" means the $275,000,000.00 revolving loan facility provided by Madeleine to entities owned and controlled by the Defendants, as evidenced by, among other things, the Loan Agreement.

12.     The term "Paradigm" means Paradigm Design and Construction, Inc. as referenced in paragraph 99 of the Answer, Affirmative Defenses and Counterclaim.

13.     The term "Party" or "Parties" means Plaintiff Madeleine L.L.C., Defendant Brian Street, Defendant James H. Cohen, and any of their parents, subsidiaries, affiliates, divisions, or

SRZ-10874672.1                                    2

agents (including attorneys), or any officer, director, employee, or other person acting on behalf of any of the foregoing.

14.     The term "Payments" means any payments, dividends, returns of capital, interest, wire transfers, deposits or other cash or in-kind distributions You received from the Defendants or the Companies during the period July 6, 2006 through the present.

15.     The term "Properties" means the eight properties (which include nine distinct projects) as referenced in paragraphs 98 and 100 of the Answer, Affirmative Defenses and Counterclaim, mezzanine financing for the development of which was provided by Madeleine through the Mezzanine Loan.

16.     The term "Relevant Time Period" means July 6, 2006 through the present.

17.     The term "You" or "Your" shall refer to Raymond J. Nicholson, any trusts or other legal entities for which Raymond J. Nicholson is trustee or a direct or indirect beneficiary, and any person acting on Your behalf.

18.     Any entity named or referred to herein shall also be deemed to include its predecessors, divisions, subsidiaries, affiliates, partnerships, joint ventures and any of the former or present principals, officers, directors, partners, employees, agents or representatives thereof.

## INSTRUCTIONS

19.     In responding to this subpoena, You are required to produce all documents that are in Your possession, custody or control, or in the possession, custody or control of any of Your representatives, employees, agents, servants or attorneys.

20.     If, in responding to this subpoena, You claim any ambiguity in interpreting a document request, or a definition or instruction applicable thereto, such claim shall not be utilized by You as a basis for refusing to respond, but You shall set forth as part of Your

response the language deemed to be ambiguous and the interpretation chosen or used in responding to the request.

21.     Whenever an objection is made to any numbered or lettered paragraph or subparagraph of any document request included in this subpoena, an answer shall be furnished to any other numbered or lettered paragraphs and subparagraphs of such document request as to which there is no objection.

22.     Whenever necessary to bring within the scope of any document request included in this subpoena information which might otherwise be construed as being outside such scope, the use of a verb in any tense shall be construed as the use of that verb in all other tenses.

23.     Except where express reference is made to another paragraph, each paragraph or subparagraph herein shall be construed independently and not by reference to any other paragraph for the purpose of limitation.

24.     If any document to be produced is known to have existed and cannot now be located, or has been destroyed or discarded, then identify the document and for each such document set forth:

        a.     the last known custodian;

        b.     whether the document is missing or lost or was destroyed or discarded;

        c.     the date of loss, destruction or discard;

        d.     the manner of destruction or discard;

        e.     the reasons for destruction or discard;

        f.     the persons authorizing or carrying out such destruction or discard;

        g.     the efforts made to locate lost or misplaced documents; and

        h.     a statement describing the document, including a summary of its contents.

25.     If any requested document is subject to destruction under any document retention or document destruction program, the document(s) should be exempted from any scheduled destruction until the conclusion of this lawsuit or unless otherwise permitted by the Court.

26.     If You claim that any document that is required to be produced by You in response to any of the following document requests is privileged, provide the information required by Rule 26(b)(5) of the Federal Rules of Civil Procedure and Rules 26.2(a) and (c) of the Local Civil Rules of the Southern and Eastern Districts of New York.

27.     If You claim that any document that is responsive to any of the following requests is no longer in Your possession, custody or control for any reason, including any documents which have been destroyed, You are directed to identify the document and:

        a.     state the reason why the document is no longer in Your possession, custody or control;

        b.     describe the general subject matter of the document;

        c.     state the date the document left Your possession, custody or control; and

        d.     identify the person who has possession, custody or control of the document.

28.     The document requests contained in this subpoena are of a continuing nature and in the event additional responsive information becomes available to You, or You become aware of or acquire in Your possession, custody or control additional responsive documents, You are requested promptly to provide such additional information and produce such additional documents for inspection and copying.

29.     All documents are to be produced in their entirety, without abbreviation or expurgation.

## DOCUMENT REQUESTS

1.      Documents sufficient to identify Your current home and business addresses, telephone numbers and any email or instant messaging addresses used by You or on Your behalf.

2.      Documents sufficient to identify any accounts at any Financial Institutions, held directly or indirectly by You or on Your behalf, or for which you are the trustee or a direct or indirect beneficiary, and into which any Payments from the Defendants or the Companies were received or ultimately deposited during the Relevant Time Period.

3.      Documents sufficient to identify any accounts at any Financial Institutions held by or on behalf of the Defendants or the Companies and from which You received any Payments during the Relevant Time Period.

4.      All documents, including bank statements, financial statements, cancelled checks, wire transfer records, deposit slips, general ledgers, account reconciliations, spreadsheets, books of original entry including cash receipts journals, cash flow statements and electronically prepared or stored records, directly or indirectly evidencing any Payments from the Defendants or the Companies received by You or on Your behalf during the Relevant Time Period.

5.      All documents and Communications concerning the purported source of any funds used by the Defendants or the Companies to make Payments to You during the Relevant Time Period.

6.      All documents and Communications concerning the dates and amounts of, and purposes and reasons for, any actual or contemplated Payments from the Defendants or the Companies to You during the Relevant Time Period.

7.      All documents and Communications concerning any Ground Lease Rent paid or unpaid by the Defendants or the Companies during the Relevant Time Period, including but not

SRZ-10874672.1                                     6

limited to all documents and Communications concerning the dates, amounts, and reasons for any unpaid 2007 or 2008 Ground Lease Rent owed to the City of North Miami.

8.     All documents and Communications concerning any cash shortfalls or insufficiencies at any of the Properties during the Relevant Time Period, including but not limited to all documents and Communications concerning the costs and expenses at the Properties which were purportedly paid using the $1,265,260.45 in delinquent Ground Lease Rent or the $500,000 transferred from the Escrow Account to Paradigm as stated by the Defendants in paragraphs 92, 93, 94, 95, 123, 124, 127, 128 and 132 of the Answer, Affirmative Defenses and Counterclaim.

9.     All documents and Communications between You (or on Your behalf) on the one hand, and any Party on the other hand, concerning the Complaint or any allegations contained therein.

10.     All documents and Communications between You (or on Your behalf) on the one hand, and any Party on the other hand, concerning the Answer, Affirmative Defenses and Counterclaim or any allegations contained therein.

Exhibit 1

Raymond N. Hannigan (rhannigan@herrick.com)          **Document Electronically Filed**
2 Park Avenue
New York, NY 10016
Phone: 212.592.1400
Fax:   212.592.1500
Attorneys for Defendants
Brian Street and James Cohen

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
MADELEINE L.L.C.,                                  :
                                                   :
                          Plaintiff,               :
                                                   : Case No. 08 Civ. 10520 (MGC)
                                                   :
            vs.                                    :
                                                   :
BRIAN STREET and JAMES COHEN,                      : **ANSWER, AFFIRMATIVE**
                                                   : **DEFENSES  AND COUNTERCLAIM**
                          Defendants.              :
                                                   :
                                                   :
                                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Defendants Brian Street and James Cohen ("Defendants"), by and through their

attorneys, Herrick, Feinstein LLP, as and for their Answer, Affirmative Defenses and

Counterclaim to the Complaint of  Madeleine, L.L.C., ("Madeleine" or "Plaintiff") allege as

follows:

## INTRODUCTION

1.      Defendants deny the allegations of paragraph 1 of the Complaint, except

(a) admit that Plaintiff, together with Cerberus Capital Management, L.P.,  agreed to provide a

mezzanine loan (the "Mezzanine Loan") to certain borrowers (the "Borrowers"), (b) admit that

the Mezzanine Loan is evidenced by a Loan and Security Agreement, and related agreements

and documents (the "Mezzanine Loan Documents") and (c) refers to the Mezzanine Loan

Documents for their terms.  To the extent the allegations in Paragraph 1 are inconsistent with the Mezzanine Loan Documents, those allegations are denied.

2.      Defendants deny the allegations of paragraph 2 of the Complaint, except (a) refer to the Mezzanine Loan documents for their terms, (b) admit that Defendants are parties to a Recourse Carveouts Guaranty dated July 6, 2006 (the "Recourse Carveouts Guaranty") and (c) refer to the Recourse Carveouts Guaranty for its terms.  To the extent the allegations in Paragraph 2 are inconsistent with the Recourse Carveouts Guaranty or with the Mezzanine Loan Documents, those allegations are denied.

3.      Defendants deny the allegations of Paragraph 3 of the Complaint, except refer to the Mezzanine Loan Documents and the Recourse Carveouts Guaranty for their terms. To the extent the allegations in Paragraph 3 are inconsistent with the Recourse Carveouts Guaranty or with the Mezzanine Loan Documents, those allegations are denied.

4.      Defendants deny the allegations of Paragraph 4 of the Complaint, except (a) state that the projects for which the mezzanine financing was provided are described in the Mezzanine Loan Documents and refer to those documents for their terms, (b) admit that one of the projects to be developed with the financing from the Mezzanine Loan was the development of, *inter alia*, two residential condominium towers on Biscayne Boulevard in the City of North Miami ("Oaks I") (c) state admit upon information and belief that BLIA Developers entered into a Bifurcated Ground Lease with the City of North Miami and refer to that document for it terms.

5.      Defendants deny the allegations in Paragraph 5 of the Complaint except admit that the Florida real estate market weakened, purchaser demand for condominium units in Florida diminished and certain loans fell into default.

2

6.      Defendants deny the allegations contained in Paragraph 6 of the Complaint and state that none of the alleged transfers to or from Paradigm Design & Construction, Inc. ("Paradigm") violated any agreement with Cerberus/Madeleine or with any senior lender on any of the projects subject to the Mezzanine Loan.  Defendants further deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations as to whether and when Plaintiff was notified by the City of North Miami as to anything with respect to the Oaks I ground lease.

7.      Defendants deny the allegations contained in Paragraph 7 of the Complaint, except refers to the November 19, 2008 letter for its contents.

8.      Defendants deny the allegations contained in Paragraph 8 of the Complaint.

9.      Defendants deny the allegations contained in Paragraph 9 of the Complaint except states that in this action Plaintiff purports to seek recovery of all amounts that Plaintiff claims to be due under the Recourse Carveouts Guaranty and the Mezzanine Loan Documents.

### JURISDICTION AND VENUE

10.     The allegations contained in Paragraph 10 of the Complaint purport to state a legal conclusion for which no response is required.  To the extent a response may be required, the allegations are denied.

11.     The allegations contained in Paragraph 10 of the Complaint purport to state a legal conclusion for which no response is required.  To the extent a response may be required, the allegations are denied.

## THE PARTIES

12.     Defendants deny having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 12 of the Complaint.

13.     Defendants deny the allegations contained in Paragraph 13 of the Complaint except admit that Brian Street resides in Florida.

14.     Defendants deny the allegations contained in Paragraph 14 of the Complaint except admit that James Cohen resides in Florida.

15.     Defendants deny the allegations contained in Paragraph 15 of the Complaint

## FACTUAL ALLEGATIONS

### The Mezzanine Loan Documents

16.     Defendants deny the allegations contained in Paragraph 16 of the Complaint, except refer to the Mezzanine Loan Agreement, which is a document that speaks for itself.

17.     Defendants deny the allegations contained in Paragraph 17 of the Complaint, except refer to the Mezzanine Loan Agreement, which is a document that speaks for itself.

4

18.     Defendants deny the allegations contained in Paragraph 18 of the Complaint, except refer to the Mezzanine Loan Agreement, which is a document that speaks for itself.

19.     Defendants deny the allegations contained in Paragraph 19 of the Complaint purport to refer to the Mezzanine Loan Agreement, which is a document that speaks for itself.  To the extent the allegations in Paragraph 16 are inconsistent with the Mezzanine Loan Agreement, those allegations are denied.

20.     Defendants deny the allegations contained in Paragraph 20 of the Complaint except to refer to the Pledge and Security Agreements (each a "Pledge Agreement"), which are documents that speak for themselves.

21.     Defendants deny the allegations contained in Paragraph 21 of the Complaint, except refer to the Oaks I Pledge Agreement, which is a document that speaks for itself.

22.     Defendants deny the allegations contained in Paragraph 22 of the Complaint except refer to the Oaks I Pledge Agreement, which is a document that speaks for itself.

23.     Defendants deny the allegations contained in Paragraph 23 of the Complaint except refer to the Oaks I Pledge Agreement, which is a document that speaks for itself.

5

24.     Defendants deny the allegations contained in Paragraph 24 of the Complaint except refer to the Oaks I Pledge Agreement, which is a document that speaks for itself.

25.     Defendants deny the allegations contained in Paragraph 25 of the Complaint except refer to the Recourse Carveouts Guaranty, which is a document that speaks for itself.

26.     Defendants deny the allegations contained in Paragraph 26 of the Complaint except refer to the Recourse Carveouts Guaranty, which is a document that speaks for itself.

27.     Defendants deny the allegations contained in Paragraph 27 of the Complaint except refer to the Recourse Carveouts Guaranty, which is a document that speaks for itself.

28.     Defendants deny the allegations contained in Paragraph 28 of the Complaint except refer to the Recourse Carveouts Guaranty, which is a document that speaks for itself.

29.     Defendants deny the allegations contained in Paragraph 29 of the Complaint except refer to  the Recourse Carveouts Guaranty, which is a document that speaks for itself.

30.     Defendants deny the allegations contained in Paragraph 30 of the Complaint except refer to the Recourse Carveouts Guaranty and the Oaks I Pledge Agreement, which are documents that speaks for themselves.

6

31.    Defendants deny the allegations contained in Paragraph 31 of the Complaint except refer to the Recourse Carveouts Guaranty, the Mezzanine Loan Agreement and the Oaks I Pledge Agreement, which are documents that speak for themselves.

32.    Defendants deny the allegations contained in Paragraph 32 of the Complaint except refer to the Revolving Promissory Note, Recourse Carveouts Guaranty, Mezzanine Loan Agreement, and the Pledge Agreements, which are documents that speak for themselves.

33.    Defendants deny the allegations contained in Paragraph 33 of the Complaint.

34.    Defendants deny the allegations contained in Paragraph 34 of the Complaint except (a) state that certain of the senior loans fell into default and (b) refer to the senior loan documents, the Mezzanine Loan Agreement, and the Mezzanine Loan Documents for their terms.

35.    Defendants deny the allegations contained in Paragraph 35 of the Complaint except  refer to the January 23, 2008 notice, which is a document that speaks for itself.

36.    Defendants deny the allegations contained in Paragraph 36 of the Complaint except refer to the January 23, 2008 notice, which is a document that speaks for itself.

37.    Defendants deny the allegations contained in Paragraph 37 except admit that Plaintiff together with Cerberus had discussions with Defendants with respect to a possible

workout, and thereafter Cerberus/Madeleine had discussions with Defendants about, *inter alia,* the voluntary turnover of various entities to Cerberus/Madeleine.

38.    Defendants deny the allegations contained in Paragraph 38 of the Complaint except (a) admit that with the full cooperation of Defendants and the owner-entities, Defendants voluntarily turned over to Plaintiff ownership of the owner-entities of four properties and (b) admit that Plaintiff acquired the equity ownership interests in BLIA Developers.

39.    Defendants deny the allegations contained in Paragraph 39 of the Complaint.

40.    Defendants deny the allegations contained in Paragraph 40 of the Complaint.

41.    Defendants deny the allegations contained in Paragraph 41 of the Complaint.

### Failure to Pay Ground Lease Rent Owed to the City of North Miami

42.    Defendants deny the allegations contained in Paragraph 42 of the Complaint except refer to the Bifurcated Ground Lease, which is a document that speaks for itself.

43.    Defendants deny the allegations contained in Paragraph 43 of the Complaint except refer to the Bifurcated Ground Lease, which is a document that speaks for itself.

8

44.     Defendants deny the allegations contained in Paragraph 44 of the Complaint except refer to the Bifurcated Ground Lease, which is a document that speaks for itself.

45.     Defendants deny the allegations contained in Paragraph 45 of the Complaint except Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of allegations contained in Paragraph 45 that relate to financial information in the possession, custody or control of Cerberus/Madeleine.

46.     Defendants deny the allegations contained in Paragraph 46 of the Complaint.

47.     Defendants deny the allegations contained in Paragraph 47 of the Complaint except (a) deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 47 relating to whether, when and as to what Plaintiff was allegedly notified and as to what the City of North Miami claims to be owed and (b) state that Plaintiff, not Defendants, own and control BLIA Developers.

48.     Defendants deny the allegations contained in Paragraph 48 of the Complaint except refer to the purported September 2, 2008 notification, which is a document that speaks for itself.  Defendants deny knowledge or information sufficient to form a belief as to whether the purported September 2, 2008 notification was sent by the City of North Miami or received by Plaintiff.

49.     Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 49 of the Complaint.

50.    Defendants deny the allegations contained in Paragraph 50 of the Complaint except refer to the purported November 18, 2008 letter is a document that speaks for itself. Defendants deny knowledge or information sufficient to form a belief as to whether the purported November 18, 2008 letter was sent by the City of North Miami or received by Plaintiff.

51.    Defendants deny the allegations contained in Paragraph 51 of the Complaint except refer to the purported November 18, 2008 letter, which is a document that speaks for itself. Defendants deny knowledge, information or belief as to whether the purported November 18, 2008 letter was sent by the City of North Miami or received by Plaintiff.

52.    Defendants deny the allegations contained in Paragraph 52 of the Complaint except refer to the November 19, 2008 letter, the Bifurcated Ground Lease, the Mezzanine Loan Agreement and the Recourse Carveouts Guaranty, which are documents that speak for themselves.

53.    Defendants deny the allegations contained in Paragraph 53 of the Complaint, except refer to the November 19, 2008 letter, which is a document that speaks for itself.

54.    Defendants deny the allegations contained in Paragraph 54 of the Complaint except refer to the November 26, 2008 letter, which is a document that speaks for itself.

10

55.     Defendants deny the allegations contained in Paragraph 55 of the Complaint except refer to the November 26, 2008 letter, which is a document that speaks for itself.

### Intentional Transfer And Encumbrance of Interest Income Earned On Escrowed Unit Purchaser Deposits at Biscayne Landing

56.     Defendants deny the allegations contained in Paragraph 56 of the Complaint except refer to the Oaks I Escrow Agreement, which is a document that speaks for itself. Defendants further deny knowledge or information sufficient to form a belief as to the truth or falsity of allegations regarding financial transactions contained in records held by BLIA Developers or Plaintiff, which now owns BLIA Developers.

57.     Defendants deny the allegations contained in Paragraph 57 of the Complaint except refer to the Oaks I Escrow Agreement, which is a document that speaks for itself.

58.     Defendants deny the allegations contained in Paragraph 58 of the Complaint except refer to the Oaks I Escrow Agreement, which is a document that speaks for itself.

59.     Defendants deny the allegations contained in Paragraph 59 of the Complaint.

60.     Defendants deny the allegations contained in Paragraph 60 of the Complaint.

11

61.     Defendants deny the allegations contained in Paragraph 61 of the Complaint.

62.     Defendants deny the allegations contained in Paragraph 62 of the Complaint.

63.     Defendants deny the allegations contained in Paragraph 63 of the Complaint.

64.     Defendants deny the allegations contained in Paragraph 64 of the Complaint.

65.     Defendants deny the allegations contained in Paragraph 65 of the Complaint except refer to the November 19, 2008 notice, the Oaks I Pledge Agreement, the Recourse Carveouts Guaranty and the Mezzanine Loan Documents, which are documents that speak for themselves.

66.     Defendants deny the allegations contained in Paragraph 66 of the Complaint except refer to the November 26, 2008 letter, which is a  document that speaks for itself.

67.     Defendants deny the allegations contained in Paragraph 67 of the Complaint.

68.     Defendants deny the allegations contained in Paragraph 68 of the Complaint except refer to the December 2, 2008 notice, which is a document that speaks for itself.

12

69.     Defendants deny the allegations contained in Paragraph 69 of the Complaint except refer to the December 2, 2008 notice, which is a document that speaks for itself.

70.     Defendants deny the allegations contained in Paragraph 70 of the Complaint and state that no payments are required under the Recourse Carveouts Guaranty.

### FIRST CAUSE OF ACTION
### (Breach of Guaranty Section 2.2(a)(ii))

71.     Defendants repeat and reallege each of their responses contained in Paragraphs 1 through 70 above as if fully stated herein.

72.     Defendants deny the allegations contained in Paragraph 72 of the Complaint.

73.     Defendants deny the allegations contained in Paragraph 73 of the Complaint.

74.     Defendants deny the allegations in Paragraph 74 of the Complaint except refer to the purported November 19, 2008 notice for its contents.

75.     Defendants deny the allegations contained in Paragraph 75 of the Complaint, except refer to the November 26, 2008 letter for its contents.

76.     Defendants deny the allegations contained in Paragraph 76 of the Complaint.

13

## SECOND CAUSE OF ACTION
### (Breach of Guaranty Section 2.2(b)(i))

77.     Defendants repeat and reallege each of their responses contained in Paragraphs 1 through 76 above as if fully stated herein.

78.     Defendants deny the allegations contained in Paragraph 78 of the Complaint.

79.     Defendants deny the allegations contained in Paragraph 79 of the Complaint.

80.     Defendants deny the allegations contained in Paragraph 80 of the Complaint except refer to the November 19, 2008 notice for its contents.

81.     Defendants deny the allegations contained in Paragraph 81 of the Complaint except refer to the November 26, 2008 letter for its contents.

82.     Defendants deny the allegations contained in Paragraph 82 of the Complaint.

83.     Defendants deny the allegations contained in Paragraph 83 of the Complaint except refer the December 2, 2008 letter for its contents.

84.     Defendants deny the allegations contained in Paragraph 84 of the Complaint.

## AFFIRMATIVE DEFENSES AND COUNTERCLAIM

### Nature of the Affirmative Defenses and Counterclaim

85.     As pleaded more specifically below, this action represents nothing more than puerile retaliation by Cerberus/Madeleine for a suit commenced by Street and Cohen against Cerberus in the Supreme Court of the State of New York, captioned *North Miami Land Holdings, Ltd v. Madeleine, L.L.C.,* (Index No. 602011/08).

86.     Indeed, not just as retaliation for that suit, but also, upon information and belief, a pretext for Cerberus/Madeleine to disseminate the false pleading filed herein to the press, in Florida, as part of a blatant and illegal attempt to libel and commercially disparage and smear Street, Cohen and their development company, Boca Developers, Inc. ("Boca Developers"). *See The Daily Business Review*, BOCA DEVELOPERS SUED OVER CLAIMS OF UNPAID LOANS, December 8, 2008 ("Boca Developers and executives Brian Street and James Cohen have been sued by a Cerberus Capital management unit for the alleged nonpayment of $189.7 million in mezzanine loans and guarantees associated with nine projects in Florida...."). (Exh. A)

87.     The Plaintiff here, Madeleine LLC – owned, controlled and dominated by Cerberus, one of the largest and most secretive hedge funds in the world – was given complete and unfettered access to the financial books and records of the Boca Developers' affiliated companies which owned the properties pledged to Cerberus/Madeleine under the Mezzanine Loan Agreement at issue here.

88.     Since that time, in or around May of 2008, Cerberus/Madeleine has been searching, far and wide, for any excuse – any pretext it could find – to try to sue Street and

Cohen individually under the extremely limited terms of a "Recourse Carveouts Guaranty" Defendants executed as part of the original $275 million Mezzanine Loan. Essentially, the Mezzanine Loan was fully non-recourse, and, as is customary under these modern mezzanine loans, personal liability would only be triggered where the guarantors cause a bankruptcy filing, or take some other action that interferes with the mezzanine lender's rights to seize the collateral.

89.     Here, Street and Cohen and Boca Developers have, in fact, fully cooperated in the handover of key collateral to Cerberus/Madeleine, have not caused a bankruptcy filing, nor have they interfered, in any way, with the rights of Cerberus/Madeleine to enforce its rights. Yet, Cerberus/Madeleine, nonetheless, sues here, seeking to turn the full balance of the Mezzanine Loan of $188,477,370 into a personal obligation of Street and Cohen under that extremely limited guaranty.

90.     And, what is the basis that Cerberus/Madeleine puts forth in seeking that full and complete liability of $188,477,370? Cerberus/Madeleine makes that claim – to over $180 million of full, personal, liability – based upon the allegation that just $500,000 in monies, from one of the pledged property's accounts, was somehow improperly "voluntarily transferred" from that account which was "collateral" for the Mezzanine Loan.

91.     This incredible, lopsided claim – that $500,000 in claimed "voluntarily transferred" money can lead to over $180 million in personal liability – should certainly shock the conscience of the Court. But even putting that aside, as will be alleged below, and as will be proven through discovery and otherwise, Cerberus/Madeleine – although having all of those many months to complete its investigation – failed utterly in its due diligence on these exact matters.

16

92.     As Defendants plead further below, the $500,000 allegedly "voluntarily transferred" from the account at BLIA Developers, Ltd. ("BLIA Developers"), upon which Plaintiff hangs its legal hat, did not just disappear into the ether, nor, as they imply, into the pockets of Street or Cohen.  To the contrary, as we plead further below (a) the senior lender on the Oaks I project, which had a lien on those very monies, expressly *authorized* those funds to be released, so that they could be utilized for *other Boca Developers' projects*, and (b) the monies the Complaint pleads were improperly "transferred" to Paradigm ($490,000 is the actual number), from the account pledged as "collateral" for the Mezzanine Loan, were, *on the very same day*, transferred from Paradigm to other properties pledged as collateral for the Mezzanine Loan and there utilized *to pay necessary expenses of those Cerberus/Madeleine pledged properties*.

93.     That is, at the time that Plaintiff commenced this action, upon information and belief, it had in hand clear financial records which demonstrate that the $490,000 was not retained by "Paradigm," nor by defendants, for their personal use, but was instead used directly *to pay the expenses of projects that were pledged to Cerberus/Madeleine as collateral* – indeed, to projects that Cerberus/Madeleine ultimately took ownership of, when Plaintiff exercised its rights under the Mezzanine Loan, in 2008.

94.     That is to say, that $490,000 did not simply disappear, as "collateral" for the Mezzanine Loan, as Cerberus/Madeleine asserts.  Rather, that money went right back into the projects pledged to Cerberus; it was not "distributed" into guarantors' accounts or pockets -- it was utilized to *enhance* and improve other Cerberus/Madeleine collateral for the Mezzanine Loan.

17

95.    And the exact same thing can be said about the $1.2 million in claimed "distributed" monies that Cerberus/Madeleine seeks directly from the guarantors (but not as a basis for full recourse liability). That amount, too, was not "distributed" to, nor did it disappear into, the guarantors' bank accounts – it, too, was paid into projects pledged to Cerberus/Madeleine and thus was utilized to enhance those very "Cerberus/Madeleine projects" as "collateral" for the Mezzanine Loan

96.    Clearly, the provisions in the "Recourse Carveouts Guaranty," preventing the "voluntary transfer" of monies pledged as "collateral," and preventing "distributions," were intended to prevent Street and Cohen from taking those monies for their personal use. Those restrictions were never intended to bar the use of those funds to pay ordinary and reasonable expenses of other Boca Developer's projects, particularly where those projects were also pledged to Cerberus/Madeleine as collateral for the Mezzanine Loan and were ultimately acquired by Cerberus.

97.    Cerberus – often described as one of the largest hedge funds in the world, with some estimates placing its value at $30 Billion – is attempting to turn $490,000, allegedly "voluntarily transferred" from an account at *one* of its pledged projects, and used for ordinary and reasonable expenses at *another one* of its pledged projects, into a claim for over $180 million in personal liability. That claim is not only baseless, in light of Cerberus/Madeleine failure to complete the requisite due diligence, and to discover and plead the true and complete facts regarding those monies, it is also made in bad faith and is sanctionable.

18

**Factual Background**

98.    Since approximately 2005, Boca Developers had acquired nine properties for condominium and commercial development in Florida.

99.    Boca Developers operates those properties through an operating company called Paradigm Design & Construction, Inc. ("Paradigm"). Paradigm is similar to a holding company and at all relevant times dealt with all of the bookkeeping and administrative issues related to the nine properties.

100.    Financing for these development projects was supplied by (a) certain Senior Loans, secured by first mortgages encumbering the properties, as well as guaranties supplied by Street, Cohen and others, and (b) the $275 million Mezzanine Loan, made by Cerberus/Madeleine and secured by security interests in the entities owning each of the properties (each an "owner-entity").

101.    The Mezzanine Loan is evidenced by a Loan and Security Agreement, and is secured by two Pledge and Security Agreements, a "Limited Secured Guaranty," and a "Recourse Carveouts Guaranty," all dated July 6, 2006 (the "Mezzanine Loan Documents").

102.    The Mezzanine Loan Documents provide that Madeleine has a UCC Article 9 perfected security interest in the equity interests in the nine owner-entities, which own those 9 properties, and that Madeleine may execute upon its security and take possession of those owner-entities upon the occurrence of an event of a default under the Mezzanine Loan Documents.

103.   Essentially, the Mezzanine Loan was fully "non-recourse," and (as is customary under these modern mezzanine loans), under the "Recourse Carveouts Guaranty" personal liability to Street and Cohen would only be triggered where those guarantors caused a bankruptcy filing, or took some other action that interfered with the mezzanine lender's rights to seize the collateral.

104.   Among the properties was a 373 unit luxury condominium complex located in the City of North Miami known as Oaks I (which plaintiff describes as "Biscayne Landing"). This property was owned by an entity known as BLIA Developers.

105.   By the end of 2007, when several condominium projects were virtually complete, with many of the units under contract for sale, the Florida condominium market collapsed and currently remains in a severe recession. Due to that downturn in the market, many purchasers of condominium units defaulted and refused to close on their sales contracts. With purchasers defaulting, budgeted cash-flow expectations from sale of condominium units were not met. As a result, the Mezzanine Loan and certain of the Senior Loans declared defaults (some without basis).

106.   After that collapse, Boca Developers and the owner-entities, as well as Street and Cohen, cooperated fully with Cerberus/Madeleine regarding the projects; they did not cause any of the entities to file for bankruptcy, nor did they interfere in any way with Cerberus/Madeleine's enforcement of its rights with respect to taking ownership of the projects.

107.   In fact, Boca Developers and Defendants voluntarily turned over to Cerberus/Madeleine, and provided Cerberus/Madeleine with extensive due diligence materials on the projects. That is to say, that none of the provisions under the Recourse Carveouts

20

Guaranty, which would have triggered full personal liability, had occurred and the Mezzanine Loan, while admittedly in default, should have remained fully non-recourse.

108.    Ultimately, as part of that enforcement process, Cerberus/Madeleine acquired ownership of five of the Florida properties, including, as relevant here: (a) BLIA Developers, (b) Boca Holly Hill I Associates, L.P., (c) Las Olas Riverfront Holdings, LLC, and (d) Penninsula II Developers, Inc.   Each of these entities, at that time, owned or controlled a separate Florida condominium development.

109.    Starting in or around May of 2008, as part of that process of turning over control of these properties, Boca Developers, Street and Cohen fully and completely cooperated with Cerberus/Madeleine and delivered and turned over to Cerberus/Madeleine extensive financial records for those properties and the owner-entities, including journal entries for 2007, the time period at issue here, as well as account reconciliations and other records regarding the properties (the "Financial Records").

110.    Upon information and belief, Cerberus/Madeleine, a sophisticated hedge fund with extensive experience in reviewing accounting and financial records, performed an extensive review and analysis of the Financial Records for the properties and the owner-entities.

111.    On or about July 8, 2008, Street, Cohen and other Boca Developers related entities, commenced an action against Cerberus/Madeleine in the Supreme Court of the State of New York asserting fraud and other malfeasance by Cerberus/Madeleine and its officer and agent, Tom Arnold, in connection with the turnover of the properties. *North Miami Land Holdings, Ltd v. Madeleine, L.L.C.,* (Index No. 602011/08)

112.    Upon information and belief, Cerberus/Madeleine and Arnold were incensed by the lawsuit and, with the aid of counsel and other advisors, began to devise ways to retaliate against Street and Cohen.

113.    Upon information and belief, at or about that time Cerberus/Madeleine was well aware that there was no basis to trigger personal liability against Street and Cohen under the Recourse Carveouts Guaranty, since Street and Cohen had fully cooperated with Cerberus/Madeleine in the turnover of the owner-entities.

114.    Nonetheless, upon information and belief, Cerberus/Madeleine and its counsel and advisors, devised a strategy where they would seek to sue Street and Cohen under the Recourse Carveouts Guaranty, even if they had to manufacture a default, which did not exist.

115.    Upon information and belief, that strategy included (a) the commencement of the retaliatory and prolix lawsuit, followed by (b) a media smear campaign, whereby the pleading, Plaintiff would ultimately file, would be willfully disseminated to the press in Florida and elsewhere as part of an attempt to libel and commercially disparage Boca Developers, Street and Cohen.

116.    Upon information and belief, Cerberus/Madeleine even retained forensic accountants to scour the Financial Records of the owner-entities as part of an attempt to unearth any potential issue that might be used as a pretext for commencement of the planned retaliatory lawsuit and smear campaign.

117.    Upon information and belief, the Complaint here is the culmination of that retaliation and smear campaign and, at the time Plaintiff filed and served the Complaint,

22

Cerberus/Madeleine, and its various advisors, were well aware that the Complaint was baseless and the claims wholly manufactured.

### Plaintiff Has Manufactured Defaults Under
### The Recourse Carveouts Guaranty Out Of Thin Air
### * * *
### The claimed $500,000 Payment to Paradigm Did Not Go To Street or Cohen; It Was Utilized, The Same Day, For Other Cerberus/Madeleine Properties

118.   Within the Complaint, Plaintiff pleads that, in or around May/June of 2007, BLIA Developers improperly transferred $500,000, representing interest income on proceeds of condominium unit sales at Oaks I, to Paradigm, implying that this transfer was made to benefit defendants Street and Cohen personally. (Complaint ¶¶ 79-80)

119.   Plaintiff alleges that these claimed transfers, totaling $500,000, violate Section 2.2(b)(i) of the Recourse Carveouts Guaranty, asserting that they constitute a "voluntary transfer . . . of any collateral for the [Mezzanine] Loan in violation of the terms of the Loan Agreement." (Complaint ¶ 29, quoting Recourse Carveouts Guaranty § 2.2(b)(i))

120.   In fact, a cursory review of the extensive Financial Records and other documents, provided to Cerberus/Madeleine, demonstrate that these monies were not held within Paradigm.

121.   Rather, those Financial Records clearly demonstrate that those very monies (actually $490,000) were – *on the same day* – transferred *out* of Paradigm to various of the other properties also pledged to Cerberus/Madeleine under the Mezzanine Loan documents, and there utilized by the entities owning those properties for ordinary and reasonable expenses of those properties that were part of the collateral pool for the Mezzanine Loan.

23

122.     The $490,000, referenced in the Complaint, was actually made in two transfers, from BLIA Developers to Paradigm: (a) one received by Paradigm on May 10, 2007, and (b) the other on June 15, 2007.

123.     Thus, on May 10, 2007, Paradigm received a $250,000 transfer from BLIA Developers.  Upon information and belief, the Financial Records – previously provided to Cerberus/Madeleine – clearly demonstrate that, *on the very same day*, $250,000 in funds (indeed more than that amount) were transferred out from Paradigm to Peninsula II, Holly Hill I, and Las Olas and SOLA (also for the Las Olas project).

124.     Those monies were all utilized at Peninsula II, Holly Hill I, and Las Olas for ordinary and reasonable expenses of those projects.

125.     Peninsula II, Holly Hill I, and Las Olas are three of the projects, previously described, the owner-entities of which were pledged to Cerberus/Madeleine as collateral for the Mezzanine Loan.  Indeed, Cerberus/Madeleine later acquired all of those entities, including Las Olas Riverfront Holdings, LLC and SOLA for the Las Olas project, when Cerberus/Madeleine exercised its rights under the Mezzanine Loan.

126.     Upon information and belief, but for the payment by Paradigm, to the entities owning those properties, Cerberus, upon the takeover of those projects, would have been responsible for those very expenses.

127.     And the same thing can be pleaded about the next $240,000 that was received by Paradigm, on June 15, 2007.  The Financial Records demonstrate that this $240,000, too, was *on the very same day* transferred *out* from Paradigm to Las Olas Riverfront Holdings,

24

LLC. Moreover, those monies, too, were all utilized at Las Olas for ordinary and reasonable expenses of that project that had been pledged to Cerberus/Madeleine as collateral for the Mezzanine Loan and which was ultimately taken over by Cerberus/Madeleine when it exercised its rights.

128.    That is to say, the Financial Records are clear and unambiguous and demonstrate that the complained of funds, of $490,000 allegedly "voluntarily transferred," were not retained by Paradigm, nor were they paid to Street or Cohen. Rather, those funds were properly and prudently used to pay expenses of properties that had been pledged to Cerberus/Madeleine; expenses that, if not so paid, would have become the responsibility of Cerberus/Madeleine upon their taking control of those entities.

129.    Further, the Oaks I Senior Lender, whose collateral included the interest monies transferred by BLIA Developers to Paradigm on May 10, 2008 and June 15, 2008, had knowledge of and consented to those transfers.

130.    Moreover, the same thing can be said about Count One of the Complaint, which does not seek "full recourse," of $180 million, but rather partial recourse against Street and Cohen in the amount of $1.2 million.

131.    There, the allegation is that Street/Cohen somehow improperly "distributed" $1.2 million, purportedly in violation of Section 2.2(a)(ii) of the Recourse Carveouts Guaranty. (Complaint ¶¶ 44-52). The allegation is that BLIA Developers' alleged retention of these monies was a "distribution," with the implication made that this money somehow wound up the personal funds of Street or Cohen.

25

132.   But, those monies too were also used for the benefit of Cerberus/Madeleine projects, directly to the benefit of Cerberus/Madeleine. That amount, too, did not disappear into the guarantors' bank accounts – it, too, was paid into projects pledged to Cerberus/Madeleine and thus was utilized to enhance those very "Cerberus/Madeleine projects" as "collateral."

133.   The Recourse Carveouts Guaranty, by its plain words, and by its clear import, was intended to prevent (a) interference with enforcement rights under the Mezzanine Loan Agreements, and (b) arguably (although with some question here), the improper disbursement to Street and Cohen of pledged funds for their personal use. It was, clearly, never intended to be used to turn the payment of ordinary and reasonable expenses, of properties pledged to Cerberus/Madeleine, into an excuse to seek $180 million in full recourse liability from Street and Cohen.

### Cerberus/Madeleine's Willful Dissemination of A False Pleading

134.   By the time Cerberus/Madeleine commenced this action, it had already acquired ownership of BLIA Developers, as well as each of the owner entities of the projects to which monies were allegedly wrongly transferred, *to wit*, Penninsula II, Holly Hill I, Las Olas. and SOLA.

135.   As a result, Cerberus/Madeleine had full control and ownership of those projects and entities and access to all of the books and records related thereto, including bank statements and the Financial Records as aforesaid.

26

136.  Indeed, upon information and belief, Cerberus/Madeleine either itself or with the aid of outside professional, performed a full forensic audit and review of all of those extensive Financial Records.

137.  Upon information and belief, among the items uncovered during that audit and financial review were the very records demonstrating that, on the very same day that the alleged $500,000 in money was received by Paradigm, there were book entries and accounting statements demonstrating a corresponding payment from Paradigm of those same amounts to other entities pledged to Cerberus/Madeleine as part of the Mezzanine Loan.

138.  That is, upon information and belief, Cerberus/Madeleine, its counsel, assistants and agents, had actual knowledge that (a) the monies received by Paradigm did not go to Street and Cohen, but instead had been utilized to pay ordinary and reasonable expenses of properties pledged to Cerberus/Madeleine under the Mezzanine Loan, thus enhancing the value of the collateral, and (b) accordingly, that the claimed triggering of full $180 million in personal liability for Street and Cohen, under the Recourse Carveouts Guaranty, was wholly without basis and a sham.

139.  Upon information and belief, notwithstanding that prior actual knowledge, Cerberus/Madeleine nonetheless determined to file the Complaint here anyway, as part of its true goal (a) to harass and retaliate against Street and Cohen, for the New York State court action, and (b) to create a pleading which, under misguided claims of privilege, could be disseminated to the press as part of a campaign dedicated to smearing, libeling and commercially disparaging Boca Developers, Street and Cohen in Florida, where they do business.

140.    Upon information and belief, Cerberus/Madeleine even retained public relations professionals, expert in generating publicity in Florida, as part of its plan to smear, libel and commercially disparage Boca Developers, Street and Cohen in Florida.

141.    Upon information and belief, copies of the Complaint, containing the false and manufactured allegations, including the allegations that Street and Cohen were personally liable to Cerberus/Madeleine for $180 million under the Recourse Carveouts guaranty, were distributed to those public relations professionals even before the Complaint was filed, so that the press would be prepared to publish the false and defamatory stories at or around the time this action was commenced. Alternatively, upon information and belief, Cerberus/Madeleine distributed to those public relations professionals, or other assistants, press releases or talking points outlining the allegations contained in the false pleading it intended to file herein.

142.    The Complaint in this action was filed on December 4, 2008, a Thursday.

143.    Upon information and belief, copies of the Complaint were not made available to the public online, or from the Court records, until several days after that filing. Indeed, Defendants, after learning of the filing on December 4th, made efforts to obtain a copy of the pleading but could not obtain a copy online or from the court, even with prior knowledge that an action had been filed.

144.    Notwithstanding, on Monday, December 8, 2008 – only four days after Plaintiff had commenced this action, and over a weekend – an article appeared in a Florida publication, *The Daily Business Review* entitled "Boca Developers Sued Over Claims of Unpaid Loans." Bloomberg is cited as having taken part in the article.

28

145.    That December 8th article repeated the false allegations contained in the Complaint herein, falsely claiming, among other things, that "Street and Cohen also violated loan terms by transferring $500,000 in escrow deposits for condo sales at Biscayne Landing to their management company, Paradigm Design and Construction the suit says." The article further repeats the false allegations, plead within the Complaint, that Street and Cohen are personally liable for over $189.7 million dollars under the Recourse Carveouts Guaranty. *See The Daily Business Review*, Boca Developers Sued Over Claims of Unpaid Loans, December 8, 2008 ("Boca developers and executives Brian Street and James Cohen have been sued by a Cerberus Capital management unit for the alleged nonpayment of $189.7 million in mezzanine loans and guarantees associated with nine projects in Florida...."). (Exh. A)

146.    Upon information and belief, Cerberus/Madeleine, through agents and public relations professionals (a) planted this story, and (b) as part of that process of garnering this false and defamatory publicity for Street and Cohen and Boca, willfully disseminated a copy of the false Complaint (or summaries of the allegations with the Complaint) to reporters and news sources, including *The Daily Business Review, Bloomberg* and others.

147.    Upon information and belief, at or about that time, the Complaint was not available from the Southern District of New York and had been distributed by Cerberus/Madeleine or their counsel or agents.

148.    Upon information and belief, at or about that time, Cerberus/Madeleine, its counsel and agents, operated under a false belief that false and libelous allegations made within a pleading are protected or privileged, even when willfully disseminated to the press, when the action of willfully disseminating a false pleading is in fact tortious and actionable.

29

149.    Upon information and belief, Cerberus/Madeleine also provided a copy of the false pleading, summaries of the false pleading, or other false and disparaging information to the *South Florida Business Journal*. (Exh. B)

150.    On or about December 15, 2008 that publication published an article entitled "*Cerberus Files $190 Million Suit Over Mezzanine Loans*." That article repeats the same spurious allegations contained in the Complaint, including with respect to the claimed $500,000 transfer: "The Cerberus suit also alleges BLIA Developers improperly transferred $500,000 from interest on escrowed unit deposits to Paradigm Design & Construction." Statements are made within that article, tied to the Complaint, asserting that Boca Developers "is not a credible developer" and that the City of North Miami should not deal with Boca. (Exh. B)

151.    A December 15, 2008 article also appears in *The Daily Business Review*, and again repeating the spurious and false allegations made in the Complaint, including the false allegations that escrow monies were wrongfully transferred to Paradigm, which is described as "a management company [Street and Cohen] own." (Exh. C)

152.    This disparaging and false information has been extremely damaging to Street, Cohen and their companies. For example, Boca still retains substantial interests in the property leased from the City of North Miami. Although Cerberus/Madeleine has acquired the ownership of the Oaks I project, Boca entities still hold interest on the other portions of the property leased from the City of Miami for development of the other sections of the originally planned Biscayne Landing development. Boca has already faced opposition from local activists regarding the development and the false and disparaging information disseminated by Cerberus/Madeleine has only made the situation worse.

30

153.    Upon information and belief, Cerberus/Madeleine is willfully and maliciously disseminating the false Complaint and other false and libelous information for the purpose libeling and injuring Street, Cohen and their companies, in their business and in the South Florida business community and in their relationship with the City of North Miami.

154.    As a direct and proximate result of Cerberus/Madeleine's wrongful actions, Street, Cohen, and their companies have suffered and will continue to suffer damages in an amount to be determined at trial.

## AFFIRMATIVE DEFENSES

### AS AND FOR A FIRST AFFIRMATIVE DEFENSE
### (No Personal Liability Under the Recourse Carveouts Guaranty)

155.    Defendants repeat and reallege Paragraphs 1 through 154 of this Answer, Affirmative Defenses and Counterclaim as if fully set forth herein.

156.    Plaintiff's claims fail because the alleged transfers do not trigger personal liability under the Recourse Carveouts Guaranty, which is a limited guaranty. As is made clear in Article II of the Recourse Carveouts Guaranty, that guaranty is intended to impose personal liability for the full loan amount only in extraordinary circumstances or in response to some major action by the guarantors, such as where the guarantors actively assist in putting the owner-entities into bankruptcy -- which of course, was never done. The Recourse Carveouts Guaranty was never intended to trigger full personal liability on a $180 million loan by virtue of a transfer of $490,000, which was used to benefit Cerberus/Madeleine and to pay the reasonable and ordinary expenses of Cerberus/Madeleine entities.

157.    As alleged herein, the transferred monies upon which Plaintiff bases its claim to full recourse were not retained by Paradigm and were not paid to Street or Cohen. Instead, the $490,000 was properly and prudently used to pay the expenses of properties that had been pledged to Cerberus/Madeleine; expenses that, if not so paid, would have become the responsibility of Cerberus/Madeleine upon their taking control of those entities.

### AS AND FOR A SECOND AFFIRMATIVE DEFENSE
### (Plaintiff Has Misconstrued and Misinterpreted the Meaning and Intention of Section 2.2(b)(i) of the Recourse Carveouts Guaranty)

158.    Defendants repeat and reallege Paragraphs 1 through 157 of this Answer, Affirmative Defenses and Counterclaim as if fully set forth herein.

32

159.   In bringing this action, Plaintiff has misconstrued and misinterpreted the meaning and intention of Section 2.2(b)(i) of the Recourse Carveouts Guaranty and in particular the meaning of the word "collateral." Plaintiff's claims are barred because the challenged transfers of funds to Paradigm are not a "voluntary transfer or encumbrance of collateral" in violation of Section 2.2(b)(i) or any other terms of the Recourse Carveouts Guaranty or the Mezzanine Loan Documents. Full recourse under the Recourse Carveouts Guaranty would only be triggered where there was some transfer of the equity in the ownership entities pledged to Cerberus/Madeleine or a major interference with Cerberus/Madeleine's right to take control of the entities; full recourse is not triggered from the mere transfer of monies from an account related to one Cerberus/Madeleine pledged project, over to an account at another entity also pledged to Cerberus/Madeleine.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE
### (Breach of Contract and the Covenant of Good Faith and Fair Dealing)

160.   Defendants repeat and reallege Paragraphs 1 through 159 of this Answer, Affirmative Defenses and Counterclaim as if fully set forth herein.

161.   Plaintiffs claims are barred because Plaintiff has breached the Guaranty and the covenant of good faith and fair dealing contained therein.   Among other things, Plaintiff's have improperly manufactured a default based upon entirely proper transfers of $490,000 to now spuriously demand payment of over $180 million.   In addition, upon information and belief, Plaintiff has willfully disseminated its false pleading to the press and used that pleading and other false information to defame and disparage Street, Cohen and their companies.

33

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE
### (Estoppel)

162.    Defendants repeat and reallege Paragraphs 1 through 161 of this Answer, Affirmative Defenses and Counterclaim as if fully set forth herein.

163.    Plaintiff's claims are barred because Plaintiff is estopped from challenging the validity of the transfers and payments at issue here. Cerberus Madeleine had full access to the books and records of BLIA Developers and each of the entities to whom the challenged transfers were ultimately made. Further, Cerberus/Madeleine accepted the benefits of those transferred funds, which maintained and benefit the collateral it held under the Mezzanine Loan, and ultimately benefited Cerberus/Madeleine directly when Cerberus/Madeleine acquired ownership of those projects.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE
### (First Filed Action/Abstention)

164.    Defendants repeat and reallege Paragraphs 1 through 163 of this Answer, Affirmative Defenses and Counterclaim as if fully set forth herein.

165.    This action is barred by reason of a first filed action, commenced in the Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County, Florida, captioned *Brian Street and James Cohen v. Madeleine, LLC and BLIA Developers, Ltd.*, Case No. 50 2008 CA037751.

166.    This answer is filed without prejudice to Defendant continuing that action, or its claims that this action should be stayed in favor of that first commenced action in Palm Beach County Florida, where this dispute more properly is venued.

34

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

167.    Defendants repeat and reallege Paragraphs 1 through 166 of this Answer, Affirmative Defenses and Counterclaim as if fully set forth herein.

168.    The Complaint fails to state a claim upon which relief can be granted.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

169.    Defendants repeat and reallege Paragraphs 1 through 168 of this Answer, Affirmative Defenses and Counterclaim as if fully set forth herein.

170.    For the reasons set forth above, the Plaintiff's claims are barred by the doctrine of unclean hands.

## AS AND FOR A EIGHTH AFFIRMATIVE DEFENSE
### (Waiver and Laches)

171.    Defendants repeat and reallege Paragraphs 1 through 170 of this Answer, Affirmative Defenses and Counterclaim as if fully set forth herein.

172.    For the reasons set forth above, the Plaintiff's claims are barred by the doctrines of waiver and laches.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE
### (Failure of Damages)

173.    Defendants repeat and reallege Paragraphs 1 through 172 of this Answer, Affirmative Defenses and Counterclaim as if fully set forth herein.

174.    For the reasons set forth above, the Plaintiff's claims are barred because Plaintiff has not suffered any damages by reason of the alleged wrongful conduct.

35

### AS AND FOR A TENTH AFFIRMATIVE DEFENSE
#### (Failure to Mitigate Damages)

175.   Defendants repeat and reallege Paragraphs 1 through 174 of this Answer, Affirmative Defenses and Counterclaim as if fully set forth herein.

176.   Plaintiffs claims are barred to the extent that Plaintiff has failed to mitigate its damages.

### AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE
#### (Set-Off)

177.   Defendants repeat and reallege Paragraphs 1 through 176 of this Answer, Affirmative Defenses and Counterclaim as if fully set forth herein.

178.   To the extent that Defendants are held liable to Plaintiff, they are entitled to set off their damages by virtue of Cerberus/Madeleine's wrongful actions and/or inactions.

### AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE
#### (Additional Defenses)

179.   Defendants repeat and reallege Paragraphs 1 through 178 of this Answer, Affirmative Defenses and Counterclaim as if fully set forth herein.

180.   Defendants hereby reserve any and all additional, or further, defenses as may be revealed by additional information that may be acquired in discovery or otherwise.

36

## COUNTERCLAIM

### (Willful Dissemination of False Pleading /Defamation/Commercial Disparagement)

181.    Defendants/Counterclaim-Plaintiffs repeat and reallege Paragraphs 1 through 180 hereof of this Answer, Affirmative Defenses and Counterclaim as if fully set forth herein.

182.    Upon information and belief, Plaintiff-Counterclaim-Defendant Madeleine, L.L.C. is a New York limited liability Company with a principal place of business in New York.

183.    Defendant-Counterclaim Plaintiff Brian Street is a resident of Florida.

184.    Defendant-Counterclaim Plaintiff James Cohen is a resident of Florida.

185.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

186.    As pleaded above upon information and belief, plaintiff-counterclaim defendant Madeleine, acting with Cerberus, willfully distributed a false pleading and other disparaging information about Street and Cohen to the press, and specifically to *The Daily Business Review* and *The South Florida Business Journal.*

187.    As a direct and proximate result of the actions of plaintiff-counterclaim defendant, false and disparaging information about Street, Cohen and their companies was published in the foregoing newspapers both in hard copy and on-line.   Each of the published articles are annexed hereto as Exhibits A, B and C, and are incorporated herein.   The aforesaid publications were published on December 8, 2008 and December 15, 2008.

188.    Upon information and belief, at the time of the aforesaid publications, Cerberus/Madeleine was actuated by actual malice in that Cerberus/Madeleine knew that the articles and matters contained therein concerning the plaintiffs so published, were false and untrue, or were published with reckless and wanton disregard of whether they were false and untrue.

189.    In so doing, plaintiff-counterclaim-defendant with the intent to commercially disparage and injure Street and Cohen and their companies. Further, any attorney acting on behalf of Cerberus/Madeleine acted outside the scope of the pending judicial proceedings and is not protected by any judicial immunity.

190.    As a direct and proximate result of the publications and the acts of the plaintiff-counterclaim defendant in connection therewith, the counterclaim-plaintiffs have been held up to public contempt, ridicule, disgrace, and prejudice; have suffered great mental pain and anguish; and have been irreparably injured in their good names, business reputation, and social standing, and have lost the esteem and respect of their friends, acquaintances, business associates, and of the public generally.

191.    As a direct and proximate result of the wrongful actions of plaintiff-counterclaim defendant, counterclaim-plaintiffs Street and Cohen have suffered and continue to suffer damages, in an amount to be determined at trial, as well as injury to their reputations in the South Florida business community and injury to the goodwill and reputations of their companies.

WHEREFORE, defendants-counterclaim-plaintiffs seek the entry of judgment (i) dismissing the Complaint in its entirety and awarding to defendants Street and Cohen their reasonable attorneys fees and expenses incurred in defending this action and (ii) awarding to defendants-counterclaim-plaintiffs judgment on the Counterclaim (a) damages in an amount  (b) their costs and attorneys and (c)  interest as allowed by law, and (d) such other and further relief as to the Court seems just and proper.

Dated: December 23, 2008
      New York, New York

HERRICK, FEINSTEIN LLP

By_____
      Raymond N. Hannigan
      2 Park Avenue
      New York, New York  10016
      212-592-1400
      rhannigan@herrick.com

Attorneys for Defendants/Counterclaim Plaintiffs Brian Street and James Cohen

Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



--------------------------------------------------------X

MADELEINE L.L.C.

                Plaintiff,

        - against -

BRIAN STREET and JAMES H. COHEN,

                Defendants.

--------------------------------------------------------X

Civil Action No.

**COMPLAINT**



Plaintiff MADELEINE L.L.C. ("Plaintiff" or "Madeleine"), by and through its attorneys Schulte Roth & Zabel LLP, for its Complaint against defendants BRIAN STREET ("Street") and JAMES H. COHEN ("Cohen") (collectively, "Defendants" or "Guarantors") alleges as follows:

## INTRODUCTION

1.    In July 2006, Plaintiff agreed to provide a loan of up to $275,000,000.00 (the "Mezzanine Loan") to North Miami Land Holdings, Ltd. and other associated entities owned and controlled by the Defendants (collectively, "Borrowers") as part of a tranched financing structure to fund the development of residential and commercial real estate projects on nine properties located in Florida.

2.    To secure Borrowers' obligations under the Mezzanine Loan, the equity interests in the ownership entities of the nine properties (the "Property Owners"), and all accounts, money, income, profits and general intangibles in which those ownership entities had an interest, were pledged as collateral in favor of Plaintiff. As a condition to Plaintiff's provision

of mezzanine financing, Guarantors, who were principals of the Borrowers at the time the Mezzanine Loan was made, also provided Plaintiff with a limited guaranty of payment with respect to certain obligations and liabilities of the Borrowers (the "Guaranty").

3.     Under the terms of the Guaranty, the Guarantors jointly and severally guaranteed payment to Plaintiff for, *inter alia*, (i) all losses, suffered, incurred or sustained as a result of the occurrence of any distributions of cash or property to the Borrowers, pledgors or Guarantors and retained or applied by the Borrowers, pledgors or Guarantors in a manner violating the terms of the loan agreement and (ii) the full amount of the Mezzanine Loan and other amounts due and payable under the loan documents in more limited circumstances, including the occurrence and continuance of an Event of Default caused by the voluntary transfer or encumbrance of any collateral for the Mezzanine Loan in violation of the terms of the loan agreement.

4.     Among the nine projects for which Plaintiff provided mezzanine financing was the development of two residential condominium towers on Biscayne Boulevard in the City of North Miami ("Biscayne Landing"). Biscayne Landing is located on a former Superfund site owned by the City of North Miami. On October 18, 2005, the City of North Miami and BLIA Developers, Ltd. ("BLIA Developers"), an entity owned and controlled at that time by the Guarantors, entered into a long term bifurcated ground lease that gave BLIA Developers the ability to develop the property (the "Bifurcated Ground Lease"). Under the terms of the Bifurcated Ground Lease, BLIA Developers was required to pay certain ground lease rental obligations to the City of North Miami, including annual rent on all sold and unsold condominium units both before and after issuance of a Temporary Certificate of Occupancy, and

2

a one-time payment in the amount of 4% of the purchase price received on the first time sale of each condominium unit.

5.     Beginning in 2007, the Florida real estate market weakened and purchaser demand for condominium units in Florida diminished.  Due at least in part to the weakening Florida real estate market, the Property Owners defaulted on their obligations to the senior lenders for all nine of the development projects and the senior lenders on each project thereafter accelerated the Property Owners' loan obligations.  Similarly, the Borrowers defaulted on their Mezzanine Loan obligations, having failed to repay a nickel of the $151,726,383.00 in Mezzanine Loan principal borrowed from Plaintiff or any interest accrued on that principal. Accordingly, over a 20 week period during the first, second and third quarters of 2008, Plaintiff moved against five pieces of collateral securing the Mezzanine Loan, including acquiring the equity ownership interests in BLIA Developers (and consequently, Biscayne Landing) through a public UCC auction that closed on July 14, 2008.

6.     After taking over the equity ownership interests in BLIA Developers, Plaintiff learned that the Borrowers' defaults on the Mezzanine Loan extended well beyond their failure to make a single payment on their obligations to Madeleine.  On September 2, 2008, Plaintiff was notified by the City of North Miami that certain of BLIA Developers' 2007 and 2008 ground lease rent obligations owed to the City, totaling $1,265,260.45, were not paid by BLIA Developers either in full or in part.  Similarly, Plaintiff thereafter discovered that on May 8, 2007 and June 1, 2007, $500,000 in interest income earned on escrowed unit sale deposits for Biscayne Landing held in an account in the name of BLIA Developers was wire transferred to Paradigm Design & Construction, Inc. ("Paradigm"), a management company owned or otherwise controlled by the Guarantors.  Those events, which occurred without Plaintiff's prior

3

knowledge or consent, violated various agreements that the Borrowers, the pledgors and the Guarantors had with Plaintiff.

7.    By letter dated November 19, 2008, Plaintiff duly notified each of the Guarantors of those actions which violated the applicable agreements with Plaintiff. Plaintiff demanded payment from the Guarantors in the amount of $1,265,260.45 to cure the default created by the failure to pay the ground lease rental obligations owed to the City of North Miami. Plaintiff also demanded payment from the Guarantors in the amount of $664,457.63 to cure the default created by the transfer from BLIA Developers to Paradigm of interest income on escrowed unit sale deposits, which amount equals the $500,000 inappropriately transferred to Paradigm plus interest accrued at the contractual rate from the dates of the two transfers through the date of Plaintiff's demand letter.

8.    Notwithstanding their obligations under the Guaranty, Guarantors have rejected Plaintiff's demand that they fulfill their joint and several obligations to pay the amounts requested. By virtue of their refusal to comply with Plaintiff's demands, Guarantors have breached the Guaranty.

9.    By this action, Plaintiff hereby seeks to recover from Guarantors all amounts that Guarantors currently owe pursuant to the terms of the Guaranty.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). This action is between a citizen of New York state on one hand and citizens of a foreign state on the other hand and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) and pursuant to Section 6.3 of the Guaranty whereby Guarantors irrevocably waived their rights to object to the laying of venue of any dispute arising out of or relating to the Guaranty brought in any state or federal court located within New York County, New York.  In addition, the documents applicable to the Mezzanine Loan, including the Guaranty, were, in significant part, negotiated, drafted and developed in New York, with the assistance of New York counsel for Plaintiff, the Borrowers, the Biscayne Landing pledgor and the Guarantors.

## THE PARTIES

12.     Plaintiff Madeleine L.L.C. is a New York limited liability company with a principal place of business in New York.

13.     Upon information and belief, Defendant Street is a citizen and resident of the State of Florida.

14.     Upon information and belief, Defendant Cohen is a citizen and resident of the State of Florida.

15.     Upon information and belief, at all times prior to the Property Owners' defaults on their senior loan and the Borrowers' defaults on their Mezzanine Loan obligations, Defendants Street and Cohen beneficially owned and controlled, *inter alia*:  Paradigm, the management company associated with the developer entities for each of the nine properties; the Property Owners for each of the nine properties, including BLIA Developers; the Borrowers for each of the nine properties, including North Miami Land Holdings, Ltd.; and almost all of the entities that acted as pledgors for the properties, including North Miami Land Holdings, Ltd.

## FACTUAL ALLEGATIONS

### The Mezzanine Loan Documents

16.     On July 6, 2006, entities owned and controlled by the Defendants entered into a Loan and Security Agreement pursuant to which Plaintiff agreed to provide the Borrowers with a Mezzanine Loan up to a maximum principal sum of $275,000,000.00 in order to finance the development of nine properties located in Florida, including Biscayne Landing (the "Loan Agreement").

17.     A true and correct copy of the Loan Agreement is annexed as Exhibit A and incorporated herein by reference.

18.     Under the Loan Agreement, the Borrowers and pledgors, including North Miami Land Holdings, Ltd., agreed to "perform, in all material respects" the obligations, monetary or otherwise, required under any Material Contracts. (Loan Agreement, Ex. A, Section 7.1 (g).) As defined in the Loan Agreement, "Material Contracts" includes "any ground leases affecting any of the Properties." (Loan Agreement, Ex. A, p. 11.)

19.     The Loan Agreement also contains a negative covenant in which the Borrowers agreed not to "pay any dividends or other payments or return any capital to any of its respective partners, members, owners or shareholders or any other Affiliate or make any distribution of assets, rights, options, obligations or securities to any of its respective partners, members, shareholders or owners or any other Affiliates without Lender's consent" so long as any portion of the Mezzanine Loan remained unpaid. (Loan Agreement, Ex. A, Section 7.2(q).)

20.     To secure the obligations owed to Plaintiff under the Loan Agreement, each Borrower and other non-borrower pledgors executed Pledge and Security Agreements (the "Pledge Agreements") in favor of Plaintiff, including a Pledge and Security Agreement with

6

respect to Biscayne Landing, dated as of July 6, 2006, executed by North Miami Land Holdings, Ltd. in favor of Plaintiff (the "Biscayne Landing Pledge Agreement").

21.     A true and correct copy of the Biscayne Landing Pledge Agreement is annexed hereto as Exhibit B and incorporated by reference.

22.     The Biscayne Landing Pledge Agreement defines an "Event of Default" as including a situation in which "Pledgor transfers or encumbers any portion of the Collateral in violation hereof or of the Loan Agreement." (Biscayne Landing Pledge Agreement, Ex. B, Section 9(a)(i).)

23.     As defined in the Biscayne Landing Pledge Agreement, the term "Collateral" encompasses "a first priority security in all of Pledgor's right, title and interest" in "(i) all Pledged Interests; (ii) all 'accounts,' 'general intangibles,' 'instruments' and 'investment property' … constituting or relating to the foregoing; and (iii) to the extent not otherwise part of the Pledged Interests, all Proceeds, income and profits thereof and all property received in exchange or substitution thereof, of any of the foregoing property of the Pledgor." (Biscayne Landing Pledge Agreement, Ex. B, Section 2.)

24.     As defined in the Biscayne Landing Pledge Agreement, the term "Pledged Interests" includes, *inter alia*, all equity interests in BLIA Developers held by North Miami Land Holdings, Ltd., "all accounts and general intangibles arising out of, or in connection with" the interests in BLIA Developers held by North Miami Land Holdings, Inc. and "any and all moneys or property due and to become due to [North Miami Land Holdings, Ltd.] now or in the future in respect of the interests in [BLIA Developers], or to which [North Miami Land Holdings, Ltd.] may now or in the future be entitled in its capacity as a member, partner, shareholder or other equity holder of" BLIA Developers. (Biscayne Landing Pledge Agreement, Ex. B, p. 3.)

7

25.     As further security for the Mezzanine Loan, and as a condition to Plaintiff entering into the Loan Agreement, the Guarantors also executed the Guaranty, dated July 6, 2006, in favor of Plaintiff.  Under the Guaranty, the Guarantors irrevocably and unconditionally guaranteed to Plaintiff the payment and performance of certain "Guarantied Obligations" defined in Section 2.2 of the Guaranty.

26.     A true and correct copy of the Guaranty is annexed as Exhibit C and incorporated herein by reference.

27.     In Section 2.2(a) of the Guaranty, the Guarantors agreed, *inter alia*, to pay Plaintiff upon demand "for all losses suffered, incurred or sustained by Lender by reason of ... any Distributions paid to Borrower, any Pledgor or Guarantor, and retained or applied ... in violation of the terms of the Loan Agreement, which remains uncured 10 days after Lender's written demand upon Guarantor." (Guaranty, Ex. C, Section 2.2(a)(ii).)  Section 2.2(a) of the Guaranty states in its entirety that:

> Guarantors irrevocably and unconditionally agree to be liable as the primary obligors for all losses suffered, incurred or sustained by Lender by reason of (i)  fraud or intentional material representation in connection with the [Mezzanine] Loan or the execution and the delivery of the Loan Agreement, the Note or the other Loan Documents; (ii) any Distributions paid to Borrower, any Pledgor or Guarantor, and retained or applied by Borrower, any Pledgor or Guarantor in violation of the terms of the Loan Agreement, which remains uncured 10 days after Lender's written demand upon Guarantor; (iii) Borrower's failure to maintain cash equity capitalization of not less than $50,000,000.00, as required under Section 7.1(n) of the Loan Agreement; provided, however, that nothing herein shall be deemed a guaranty of the continued value of the Properties; (iv) the knowing and intentional failure by Borrower, any Pledgor or Guarantor to use the proceeds of the Properties or [Mezzanine] Loan proceeds, to the extent available, to pay, or to cause the payment of, taxes, which failure results in liens on any of the Properties; (v) any act

8

of arson or intentional physical waste at any of the
Properties by Borrower, any Pledgor or Guarantor; and (vi)
an Event of Default as under and as such term is defined in
the Loan Agreement by reason of Borrower's failure to
satisfy its obligations under the Loan Agreement with
respect to financial reporting, which failure remains
uncured 30 days after Lender's written demand upon
Guarantor.

28.    As used in Section 2.2 (a)(ii) of the Guaranty, the term "Distributions"

includes, *inter alia*, "any rents, security deposits and other revenues generated at or from any of

the Properties, any deposits under contracts of sale or proceeds of sale of any portion of any or

more of the Properties." (Guaranty, Ex. C, p. 2.)

29.    In Section 2.2(b) of the Guaranty, the Guarantors agreed to pay Plaintiff

"on demand for the full amount of the [Mezzanine] Loan and all other amounts due and payable

to Lender under the Loan Documents in the event of ... an Event of Default by reason of the

voluntary transfer or encumbrance of any collateral for the [Mezzanine] Loan in violation of the

terms of the Loan Agreement which remains uncured 10 days after Lender's written demand

upon Guarantor." (Guaranty, Ex. C, Section 2.2(b)(i).) Section 2.2(b) of the Guaranty states in

its entirety that:

Guarantor hereby guaranties payment to Lender on demand
for the full amount of the [Mezzanine] Loan and all other
amounts due and payable to Lender under the Loan
Documents in the event of (i) an Event of Default by reason
of the voluntary transfer or encumbrance of any collateral
for the [Mezzanine] Loan in violation of the terms of the
Loan Agreement which remains uncured 10 days after
Lender's written demand upon Guarantor; (ii) Borrower,
any Pledgor or any Property Owner (as such term is defined
in the Loan Agreement) becoming subject of (A) a
voluntary bankruptcy or insolvency proceeding (in the case
of a Property Owner, where any Borrower or any Pledgor
has acquiesced in such voluntary proceeding) or (B) an
involuntary bankruptcy or insolvency proceeding
commenced by any Person other than Lender where any
Borrower or any Pledgor has taken collusive action in the

9

involuntary proceeding with its creditors other than Lender; (iii) Borrower, any Pledgor or Guarantor (1) soliciting or causing to be solicited petitioning creditors for any involuntary petition against Borrower, any Pledgor or any Property Owner from any Person, or (2) filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against Borrower, any Pledgor or any Property Owner, by any other Person other than Lender under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition from any Person; (iv) Borrower, any Pledgor or Guarantor consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee or examiner for Borrower, any Pledgor, any Property Owner or any portion of any of the Properties commenced by a person other than Lender; (v) Borrower, any Pledgor or Guarantor defending against an exercise, following the occurrence of an Event of Default, of Lender's remedies with respect to collateral for the [Mezzanine] Loan consisting of direct or indirect beneficial ownership interests in any of BLIA Developers, Ltd., Maule Lake Marina, LLC, Holly Hill Associates, Ltd. or Marina Grande Associates, Ltd. (provided, however, that this provision shall not apply to an action by Borrower, any Pledgor or Guarantor contesting the validity of Lender's claim that an Event of Default has occurred in which such Borrower, Pledgor or Guarantor shall be the prevailing party); and (vi) Borrower, any Pledgor or Guarantor failing or refusing to execute and deliver documents reasonably requested by Lender pursuant to Section 10.12 of the Loan Agreement in order to effect a splitter and severance of the [Mezzanine] Loan as contemplated therein.

30.     As used in Section 2.2 (b)(i) of the Guaranty, the term "Event of Default" has the meaning ascribed to it in the Pledge Agreements, including specifically, the definition of "Event of Default" stated in Section 9(a) of the Biscayne Landing Pledge Agreement. (Guaranty, Ex. C, Section 6.11.)

31.     As the "Lender," as that term is defined and used in both the Loan Agreement and the Guaranty, and as the "Pledgee," as that term is defined and used in the

10

Biscayne Landing Pledge Agreement, Plaintiff is entitled to all of the rights and remedies provided for in those documents, in law or in equity.

### The Borrowers', Pledgors' and Guarantors' Failure To Satisfy Their Loan Obligations

32.   In connection with the Mezzanine Loan, the Borrowers, including North Miami Land Holdings, Ltd., entered into a Revolving Promissory Note in favor of the Plaintiff, promising to repay the aggregate principal amount actually lent by Plaintiff to Borrowers under the Loan Agreement, up to $275,000,000.00.  Pursuant to the Loan Agreement and the Promissory Note, and induced by the Pledge Agreements and the Guaranty, Plaintiff disbursed Mezzanine Loan proceeds to the Borrowers in the aggregate principal amount of $151,726,383.00, consisting of principal Mezzanine Loan draws disbursed on the following dates and in the following amounts:

a.   July 6, 2006 for $120,303,745.00;

b.   August 29, 2006 for $4,030,915.00;

c.   September 29, 2006 for $3,879,219.00;

d.   December 11, 2006 for $7,406,816.00; and

e.   February 9, 2007 for $16,105,687.00.

33.   Since receiving the Mezzanine Loan disbursements on the dates and in the principal amounts set forth in Paragraph 32, the Borrowers have failed to repay any portion of the principal amounts, or any accrued interest thereon, to Plaintiff.

34.   Upon information and belief, beginning in 2007, the Property Owners defaulted on all the senior loans provided for each of the nine properties, none of which defaults were waived by the holder of such senior loan nor cured within any applicable cure periods under those senior loans.  The Property Owners' defaults on the senior loans also constitute

11

Events of Default on the Mezzanine Loan under the Loan Agreement. (Loan Agreement, Ex. A, Section 8.1(m).)

35.     Accordingly, by written notice dated January 23, 2008, Plaintiff notified the Borrowers that the Mezzanine Loan was in default, the balance of which as of January 1, 2008 was $204,705,895.47. Plaintiff's January 23, 2008 letter also notified the Borrowers that, beginning on January 23, 2008, the Borrowers' outstanding Mezzanine Loan obligations owed to Plaintiff would continue to accrue interest at the contractual default rate specified in the Loan Agreement.

36.     A true and correct copy of Plaintiff's January 23, 2008 notice of default to the Borrowers is annexed as Exhibit D and incorporated herein by reference.

37.     Due to the numerous existing and continuing defaults on each of the senior loans and, as a result, the Mezzanine Loan, Plaintiff had begun discussions with the Borrowers and the Guarantors regarding those defaults on or about November 7, 2007.

38.     Plaintiff thereafter acquired the equity interests in the owner-entities of five of the nine properties for which development projects were funded by the senior loans and the Mezzanine Loan. In that regard, Plaintiff acquired the equity ownership interests in BLIA Developers through a public UCC sale, which closed on July 14, 2008.

39.     Since the time of the Borrowers' default on the Mezzanine Loan and as a direct result of the Property Owners' and Borrowers' numerous defaults on their obligations under the senior and Mezzanine Loans, Plaintiff made additional disbursements totaling approximately $35,000,000.00. Those additional disbursements were made for the purpose of protecting Plaintiff's interests in the collateral securing the Mezzanine Loan.

40.     As of the date of this Complaint, and after Plaintiff's acquisition of the equity interests in the owner-entities of five of the nine pieces of collateral securing the Mezzanine Loan, a total amount of at least $188,477,370.00 is still owed to Plaintiff under the Mezzanine Loan documents.

41.     Subsequent to its acquisition of the equity ownership interests in BLIA Developers, Plaintiff became aware of certain events relating to BLIA Developers and Biscayne Landing, which events occurred prior to Plaintiff's acquisition of the equity ownership interests in BLIA Developers – and without Plaintiff's prior knowledge or consent – and constitute violations of, *inter alia*, the Loan Agreement and the Biscayne Landing Pledge Agreement.

### Failure To Pay Ground Lease Rent Owed To The City Of North Miami

42.     Unlike the other eight properties on which entities owned by the Guarantors were developing properties using senior loan and Mezzanine Loan proceeds, the parcel of land on which the residential condominium towers known as Biscayne Landing were built was not owned outright by Guarantors or entities under Guarantors' beneficial ownership or control. Rather, BLIA Developers owned a ground leasehold interest in that property pursuant to the Bifurcated Ground Lease entered into by and between BLIA Developers and the City of North Miami on October 18, 2005, and duly recorded with the Clerk of Court in Miami-Dade County, Florida on October 20, 2005.

43.     A true and correct copy of the Bifurcated Ground Lease is annexed as pages 76-116 of Exhibit E – the Bifurcated Ground Lease and Estoppel Agreement – and incorporated herein by reference.

44.     Pursuant to Article II of the Bifurcated Ground Lease, BLIA Developers is required to pay certain ground lease rental obligations to the City of North Miami. Specifically, BLIA Developers' was obligated to: (i) pay Basic Rent to the City of North Miami annually in

13

the amount of $750 per unit prior to the issuance of a Temporary Certificate of Occupancy for such unit; (ii) pay Adjusted Basic Rent to the City of North Miami annually in the amount of $1500 per unit after the issuance of a Temporary Certificate of Occupancy for such unit, prorated from the date on which the Temporary Certificate of Occupancy was issued; and (iii) pay a one-time Additional Rent upon the first-time sale of each unit in the amount of 4% of the purchase price received for each unit sold.

45.      Upon information and belief, all amounts required to be paid by BLIA Developers to the City of North Miami pursuant to the Bifurcated Ground Lease were appropriately collected by or on behalf of BLIA Developers, North Miami Land Holdings, Ltd. and/or the Guarantors.

46.      Despite the amounts required to be paid to the City of North Miami pursuant to the Bifurcated Ground Lease being appropriately collected and unbeknownst to Plaintiff, BLIA Developers, North Miami Land Holdings, Ltd. and/or the Guarantors systematically failed to pay certain of the ground lease rental obligations owed to the City of North Miami.

47.      Indeed, after purchasing the equity ownership interests in BLIA Developers in July 2008, Plaintiff was notified by the City of North Miami on September 2, 2008 that BLIA Developers was delinquent on its ground lease obligations by an amount totaling $1,265,260.45. Specifically, the City of North Miami claims to be owed past due ground lease rental obligations consisting of: (i) $108,555.00 in 2007 Adjusted Basic Rent collected by BLIA Developers, North Miami Land Holdings, Ltd. and/or the Guarantors from unit purchasers as part of the unit purchase price; (ii) $80,000.00 in 2007 Adjusted Basic Rent owed by BLIA Developers on unsold units; (iii) 246,000.00 in 2008 Basic Rent owed by BLIA Developers on

14

unsold units; and (iv) $830,704.45 in 2007 and 2008 Additional Rent collected from unit purchasers as part of the purchase price on the first-time sales of units.

48.     A true and correct copy of the September 2, 2008 notification received by Plaintiff from the City of North Miami and relating to BLIA Developers' existing delinquencies in its ground lease rental obligations is annexed as Exhibit F and incorporated herein by reference.

49.     After receiving notification of the past due ground lease rental obligations from the City of North Miami, Plaintiff or its affiliates, on October 30, 2008, made an initial partial payment to the City of North Miami on BLIA Developers' past due ground lease rental obligations in the amount of $200,000.00.

50.     By letter dated November 18, 2008, the City of North Miami acknowledged payment of $200,000 received from Plaintiff or its affiliates, and reiterated its demand for the remaining past due amounts.  In so doing, the City of North Miami stated that the remaining past due ground lease rental obligations "are due regardless of whether or not another unit is sold and we expect your organization to fulfill your obligation to the city in a timely manner."

51.     A true and correct copy of the November 18, 2008 letter from the City of North Miami is annexed hereto as Exhibit G and incorporated herein by reference.

52.     By written notice dated November 19, 2008, Plaintiff notified the Guarantors of the failure to pay $1,265,260.45 in 2007 and 2008 ground lease rental obligations owed to the City of North Miami as and when they became due, and during such time as BLIA Developers continued to be owned by Guarantors or entities under Guarantors' ownership and control.  The failure to pay ground lease rent as and when it became due is a violation of Section

15

7.1(g) of the Loan Agreement. Further, under the Guaranty, all revenues generated at or from Biscayne Landing, including any proceeds of sale of any portion of Biscayne Landing, are "Distributions" and the failure of the Borrower, any non-Borrower pledgors and the Guarantors to apply those Distributions to the ground lease rent violates Section 7.1(a) of the Loan Agreement and further violates Section 2.2(a)(ii) of the Guaranty. Accordingly, Plaintiff demanded that Guarantors pay $1,265,260.45 to Plaintiff within 10 days of Plaintiff's November 19, 2008 letter.

53.     A true and correct copy of Plaintiff's November 19, 2008 notification and demand letter to the Guarantors is annexed as Exhibit H and incorporated herein by reference.

54.     By letter dated November 26, 2008, the Guarantors refused to comply with Plaintiff's demand and have, to date, failed to pay any of the $1,265,260.45 appropriately demanded to cure the delinquent 2007 and 2008 ground lease rent owed by BLIA Developers to the City of North Miami.

55.     A true and correct copy of the November 26, 2008 letter from the Guarantors to Plaintiff is annexed as Exhibit I and incorporated herein by reference.

### Intentional Transfer And Encumbrance Of Interest Income Earned On Escrowed Unit Purchaser Deposits at Biscayne Landing

56.     Upon information and belief, at the time unit purchasers at Biscayne Landing entered into contracts of sale their units, those unit purchasers were required to make cash deposits on those sales contracts. Pursuant to an agreement dated April 17, 2006 and executed between Ticor Insurance Company (the "Escrow Agent") and Defendant Cohen on behalf of BLIA Developers (the "Biscayne Landing Escrow Agreement"), all deposits on contracts of sale received by BLIA Developers from unit purchasers were deposited in escrow by BLIA Developers with the Escrow Agent.

16

57.   A true and correct copy of the Biscayne Landing Escrow Agreement is annexed as Exhibit J and incorporated herein by reference.

58.   Section 2 of the Biscayne Landing Escrow Agreement sets forth the circumstances under which the Escrow Agent was required to disburse escrowed unit sale deposits to the unit purchaser or to BLIA Developers. Among other things, Section 2 of the Biscayne Landing Escrow Agreement required the Escrow Agent to disburse escrowed funds "upon written direction duly executed by [BLIA Developers] and purchaser" and, with respect to interest earned on escrowed unit purchaser deposits, unequivocally states that distribution of "any interest earned on the purchaser's deposit" shall be made "only to [BLIA Developers]." (Biscayne Landing Escrow Agreement, Ex. J, Section 2(f).)

59.   Upon information and belief and without Plaintiff's prior knowledge or consent, notwithstanding the plain language of the Biscayne Landing Escrow Agreement mandating that interest income earned on the escrowed unit purchaser deposits be distributed only to BLIA Developers, North Miami Land Holdings, Ltd. and/or other entities beneficially owned or controlled by the Guarantors requested on no fewer than two occasions that portions of the interest income earned on the escrowed unit purchaser deposits for Biscayne Landing be transferred to an entity other than BLIA Developers but beneficially owned and controlled by the Guarantors.

60.   Upon information and belief, on or about May 7, 2007, Sherry Baloff, an employee of the Guarantors' development company acting under the direction and on behalf the Guarantors, sent a written request to the Escrow Agent seeking to have $250,000 in interest income earned on the escrowed unit purchaser deposits at Biscayne Landing wire transferred out of the escrow account held in the name of BLIA Developers. Ms. Baloff's request to the Escrow

17

Agent was accompanied by instructions that the $250,000 in earned interest income be wire transferred to an account at Wachovia Bank, NA held in the name of Paradigm, a management company beneficially owned or controlled by the Guarantors.

61.     Upon information and belief, the Escrow Agent complied with Ms. Baloff's request and, on or about May 8, 2007, wire transferred $250,000 in interest income earned on the escrowed unit purchaser deposits at Biscayne Landing from the escrow account held in the name of BLIA Developers into an account at Wachovia Bank, NA held in the name of Paradigm.

62.     Upon information and belief, on or about May 31, 2007, Sherry Baloff, an employee of Guarantors development company acting under the direction and on behalf the Guarantors, sent an additional written request to the Escrow Agent seeking to have an additional $250,000 in interest income earned on the escrowed unit purchaser deposits at Biscayne Landing wire transferred out of the escrow account held in the name of BLIA Developers. Ms. Baloff's request to the Escrow Agent was accompanied by instructions that the $250,000 in earned interest income be wire transferred to an account at Wachovia Bank, NA held in the name of Paradigm, a management company beneficially owned or controlled by the Guarantors.

63.     Upon information and belief, the Escrow Agent complied with Ms. Baloff's request and, on or about June 1, 2007, wire transferred $250,000 in interest income earned on the escrowed unit purchaser deposits at Biscayne Landing from the escrow account held in the name of BLIA Developers into an account at Wachovia Bank, NA held in the name of Paradigm.

64.     The escrow account contemplated and set up by the Biscayne Landing Escrow Agreement, and all monies deposited therein by BLIA Developers, properly constituted

18

"Pledged Interests" and "Collateral" as those terms are used and defined in the Biscayne Landing Pledge Agreement. (Biscayne Landing Pledge Agreement, Ex. B, Section 2 and p. 3.) Accordingly, the unit purchaser deposits and the interest income earned thereon were part of the collateral pledged to Plaintiff by North Miami Land Holdings, Inc. as security for the Mezzanine Loan.

65.     By written notice dated November 19, 2008, Plaintiff notified the Guarantors of the May 8, 2007 and June 1, 2007 transfers of interest income earned on the escrowed unit purchaser deposits at Biscayne Landing from the escrow account held in the name of BLIA Developers to the account at Wachovia Bank, NA held in the name of Paradigm. (November 19, 2008 Letter to Guarantors, Ex. H.) Those transfers of interest income on the escrowed unit purchaser deposits, which served as collateral for the Mezzanine Loan, constitute Events of Default under Section 9(a)(i) of the Biscayne Landing Pledge Agreement and further violates Section 2.2(b)(i) of the Guaranty. Accordingly, Plaintiff demanded that Guarantors pay $664,457.63 within 10 days of Plaintiff's November 19, 2008 letter, which amount equals the $500,000 inappropriately transferred to Paradigm plus interest accrued at the contractual rate from the dates of the two transfers.

66.     By letter dated November 26, 2008, the Guarantors refused to comply with Plaintiff's demand and have, to date, failed to pay any of the $664,457.63 appropriately demanded to cure the Event of Default created by the voluntary transfer or encumbrance of Mezzanine Loan collateral. (November 26, 2008 Letter From Guarantors to Plaintiff, Ex. I.)

67.     By virtue of the Guarantors' refusal and failure to pay the $664,457.63 necessary to cure the Event of Default created by the voluntary transfer or encumbrance of

19

Mezzanine Loan collateral, Plaintiff is entitled to payment from the Guarantors for the full amount of the Loan and all other amounts due and payable to Plaintiff under the loan documents.

68.    As a result, by written notice dated December 2, 2008, Plaintiff notified the Guarantors of Plaintiff's right to payment from the Guarantors for the full amount of the Loan and all other amounts due and payable to Plaintiff under the loan documents pursuant to section 2.2(b)(i) of the Guaranty and demanded immediate payment from the Guarantors in the amount of $188,477,370.00.

69.    A true and correct copy of Plaintiff's December 2, 2008 notification and demand letter to the Guarantors is annexed as Exhibit K and incorporated herein by reference.

70.    To date, the Guarantors have made none of the payments required under the Guaranty and properly demanded by Plaintiff's letters dated November 19 and December 2, 2008.

### FIRST CAUSE OF ACTION

### (Breach of Guaranty Section 2.2(a)(ii))

71.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-55 of this Complaint as if fully set forth herein.

72.    Pursuant to the Guaranty dated July 6, 2006, Guarantors jointly and severally, irrevocably and unconditionally guaranteed to Plaintiff payment for all losses suffered, incurred or sustained by Plaintiff by reason of any Distributions paid to any Borrower, Pledgor or Guarantor and kept or applied by any Borrower, Pledgor or Guarantor in violation of the terms of the Loan Agreement, and further agreed to pay all court costs, attorneys fees and other costs and expenses incurred by Plaintiff in connection with enforcement or preservation of its rights under the Guaranty.

73.     As set forth above, and without Plaintiff's prior knowledge or consent, BLIA Developers, North Miami Land Holdings, Ltd. and/or the Guarantors systematically failed to pay certain 2007 and 2008 ground lease rental obligations owed to the City of North Miami as and when they became due during the time that the Guarantors, or entities beneficially owned or controlled by the Guarantors, continued to own and control BLIA Developers.

74.     By written notice dated November 19, 2008, Plaintiff notified the Guarantors of the delinquency in certain of BLIA Developers' ground lease rental obligations owed to the City of North Miami during such time as the Guarantors, or entities beneficially owned or controlled by the Guarantors, continued to own BLIA Developers. Further, Plaintiff's November 19, 2008 letter demanded payment of $1,265,260.45 from the Guarantors within 10 days pursuant to the terms of the Guaranty.

75.     By letter dated November 26, 2008, and despite Plaintiff's demand, the Guarantors have refused to pay any portion of the $1,265,260.45 that is due to Plaintiff under the terms of the Guaranty for remittance to the City of North Miami. Guarantors have thus breached Section 2.2(a)(ii) of the Guaranty.

76.     As a result of the Guarantors' breach of Section 2.2(a)(ii) of the Guaranty, Plaintiff has been damaged in the amount of at least $1,265,260.45, as well as pre-judgment and post-judgment interest and attorneys' fees and other costs and expenses to which Plaintiff is also entitled.

## SECOND CAUSE OF ACTION

### (Breach of Guaranty Section 2.2(b)(i))

77.     Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-41 and 56-70 of this Complaint as if fully set forth herein.

78.      Pursuant to the Guaranty dated July 6, 2006, Guarantors jointly and severally, irrevocably and unconditionally guaranteed to Plaintiff payment for the full amount of the Mezzanine Loan and all other amounts due and payable to Plaintiff under the loan documents by reason of an Event of Default, as that term is defined in the Biscayne Landing Pledge Agreement, caused by the voluntary transfer or encumbrance of collateral for the Mezzanine Loan in violation of the terms the Loan Agreement, and further agreed to pay all court costs, attorneys fees and other costs and expenses incurred by Plaintiff in connection with enforcement or preservation of its rights under the Guaranty.

79.      As set forth above, and without Plaintiff's prior knowledge or consent, North Miami Land Holdings, Ltd. and/or other entities beneficially owned or controlled by the Guarantors requested and caused $500,000 in interest income earned on escrowed unit purchaser deposits for Biscayne Landing held in an account in the name of BLIA Developers to be wire transferred to an account held at Wachovia Bank, NA in the name of Paradigm, a management company owned or controlled by the Guarantors, on or about May 8, 2007 and June 1, 2007.

80.      By written notice dated November 19, 2008, Plaintiff notified the Guarantors of the inappropriate May 8, 2007 and June 1, 2007 wire transfers of interest income on escrowed unit purchaser deposits to Paradigm, and demanded payment of $664,457.63 from the Guarantors, which amount equals the $500,000 inappropriately transferred to Paradigm plus interest accrued at the contractual rate from the dates of the two transfers, within 10 days pursuant to the terms of the Guaranty.

81.      By letter dated November 26, 2008, and despite Plaintiff's demand, the Guarantors refused to pay any portion of the $664,457.63 that is due to Plaintiff under the terms of the Guaranty.  Guarantors have thus breached Section 2.2(b)(i) of the Guaranty.

22

82.    Since the time of Borrowers numerous defaults under the Loan Agreement, and as permitted by the Loan Agreement, Plaintiff made additional disbursements totaling approximately $35,000,000.00 for the purpose of protecting Plaintiff's interests in the collateral securing the Mezzanine Loan.  These additional disbursements constitute part of the Guaranteed Obligations under section 2.2(b) of the Guaranty.

83.    As a result of the Guarantors' breach of Section 2.2(b)(i) of the Guaranty, Plaintiff is entitled to, and on December 2, 2008 made written demand to the Guarantors for, payment from the Guarantors for the full amount of the Loan and all other amounts due and payable to Plaintiff under the loan documents, totaling at least $188,477,370.00.

84.    To date, the Guarantor has refused to pay any portion of the amount demanded in Plaintiff's December 2, 2008 letter.  Plaintiff has thus been damaged in the amount of at least $188,477,370.00 as well as pre-judgment and post-judgment interest and attorneys' fees and other costs and expenses to which Plaintiff is also entitled.

**PRAYER FOR RELIEF**

WHEREFORE, Madeleine prays for judgment against the Defendants, jointly and severally, as follows:

A.    On the First cause of action, for breach of Section 2.2(a)(ii) of the Guaranty, awarding Plaintiff $1,265,260.45, plus all additional sums due under the Guaranty, including pre-judgment and post-judgment interest, court costs, attorneys fees and other costs and expenses incurred by Plaintiff in the enforcement or preservation of its rights under the Guaranty;

23

B.   On the Second cause of action, for breach of Section 2.2(b)(i) of the Guaranty, awarding Plaintiff at least $188,477,370.00 as well as pre-judgment and post-judgment interest, court costs, attorneys fees and other costs and expenses incurred by Plaintiff in the enforcement and preservation of its rights under the Guaranty; and

C.   Such other and further relief as the Court deems just and proper.

Dated: New York, New York
       December 4, 2008

SCHULTE ROTH & ZABEL LLP

By: _____
     Howard O. Godnick
     Michael G. Cutini

919 Third Avenue
New York, NY 10022
Tel: (212) 756-2000
Fax: (212) 756-5955
howard.godnick@srz.com
michael.cutini@srz.com

*Attorneys for Plaintiff Madeleine L.L.C.*

24

**EXHIBIT 3**

# Schulte Roth & Zabel LLP

919 Third Avenue
New York, NY 10022
212.756.2000
212.593.5955 fax

www.srz.com

Howard O. Godnick
212.756.2220

Writer's E-mail Address
howard.godnick@srz.com

April 30, 2009

**VIA FEDEX**

Raymond J. Nicholson
2494 South Ocean Blvd., Apt. 8B
Boca Raton, FL  33432

Re:  *Madeleine L.L.C. v. Brian Street and James H. Cohen*, No. 08-Civ.-10520

Dear Mr. Nicholson:

We represent Madeleine L.L.C., plaintiff in the above-referenced action.  On April 2, 2009, you were served with a lawful subpoena issued by the United States District Court for the Southern District of Florida (the "Subpoena").  A copy of the Subpoena and its attached document requests is enclosed herewith for your reference.

You have failed to comply with the Subpoena, which called for the production of certain documents at the Law Offices of Carlton Fields in Miami, Florida, by Thursday, April 30, 2009 at 10:00a.m.  Further, pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure, any objections you had to the Subpoena must have been served in writing 14 days after the Subpoena was served, or by April 16, 2009.

We write to request that you promptly comply with the Subpoena.  If we do not hear from you by May 7, 2009, we will have no choice but to seek redress from the United States District Court for the Southern District of Florida in the form of an order compelling your compliance with the Subpoena and whatever additional relief the Court may grant, including the fees and costs incurred in connection with enforcing the Subpoena.

SRZ-10892596.2

April 30, 2009
Page 2

       Please contact me if you have any questions, or if you would like to further discuss your compliance with the Subpoena.

Very truly yours,

Howard O. Godnick

Enclosure

cc:    Raymond N. Hannigan, Esq.

SRZ-10892596.2